UNITED STATES of America

v.

The **FIRST NATIONAL BANK OF MARYLAND** and **First National Bank of Harford County**

and

**William B. Camp, Comptroller of the Currency, Intervenor.**

**Civ. No. 19801.**

United States District Court
D. Maryland.
Jan. 13, 1970.

William P. McManus, Thomas P. Ruane and Eugene V. Lipkowitz, U. S. Dept. of Justice, Washington, D. C., and Stephen H. Sachs, U. S. Atty. for Dist. of Maryland, Baltimore, Md., for plaintiff.

William L. Marbury, Franklin G. Allen and E. Stephen Derby, Baltimore, Md., for defendant, The First Nat. Bank of Md.

Edward C. Wilson, Bel Air., Md., for defendant, First Nat. Bank of Harford County.

Philip L. Roache, Jr. and Charles H. McEnerney, Jr., Office of Comptroller of Currency, Washington, D. C., for intervenor.

FRANK A. KAUFMAN, District Judge.

If one could say, with apologies to Miss Gertrude Stein, that a bank is a bank is a bank, or even that a branch is a branch is a branch, perhaps this civil antitrust case involving a proposed bank merger could be said to pose issues basically legal rather than factual. Congress and the Supreme Court, it is true, have established broad legal guidelines for the separation of permitted and proscribed bank mergers. But in most antitrust cases, it is the facts which govern the determination of whether or not there is a reasonable probability that the merger will cause a substantial lessening of competition in the foreseeable future in any section of the United States. This bank merger case is no exception to that general rule.[1] The facts about the banks

---

1. *See* remarks, substantially to the same effect, of Judge Zirpoli in United States v. Crocker-Anglo National Bank, 277 F. Supp. 133, 138, 199 (N.D.Cal.1967).

and the area involved provide the governing indicators.

On October 11, 1967, The First National Bank of Maryland (First of Maryland) and First National Bank of Harford County (First of Harford) signed an agreement providing for the merger of First of Harford into First of Maryland. Application for approval by the Comptroller of the Currency (the Comptroller) under 12 U.S.C. § 1828(c) was filed on November 28, 1967. The Comptroller, acting in accordance with that statute, requested reports on competitive factors from the Board of Governors of the Federal Reserve System, the Attorney General, and the Federal Deposit Insurance Corporation (FDIC). The Board of Governors concluded that "[s]ome competition exists between * * * [the two banks] and there is a potential for increased competition between them. The over-all effect of the proposal would be adverse." The Antitrust Division of the Department of Justice stated the conclusion that "the merger would have a significantly adverse effect on competition in Harford County." The FDIC did not respond. The Comptroller, on July 19, 1968, approved the merger. The Government, on August 16, 1968, acting through the Department of Justice, instituted this proceeding to enjoin the merger, thereby causing the merger to be stayed during this proceeding; and the Comptroller thereafter became a party intervenor herein as a matter of right.

The relevant statutes are Section 7 of the Clayton Act, 15 U.S.C. § 18, and the Bank Merger Act of 1966. Section 7 provides in pertinent part:

No corporation engaged in commerce shall acquire directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any *line of commerce* in any *section of the country*, the effect of such acquisition may be *substantially to lessen competition,* or to tend to create a monopoly. [Emphasis added.]

The applicable parts of the Bank Merger Act, as set forth in 12 U.S.C. § 1828(c) state:

(5) The responsible agency [in this case, the Comptroller] shall not approve—

(A) any proposed merger transaction which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

(B) any other proposed merger transaction whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

In every case, the responsible agency shall take into consideration the financial and managerial resources and future prospects of the existing and proposed institutions, and the convenience and needs of the community to be served.

\* \* \* \* \* \*

(7) (A) Any action brought under the antitrust laws arising out of a merger transaction shall be commenced prior to the earliest time under paragraph (6) at which a merger transaction approved under paragraph (5) might be consummated. The commencement of such an action shall stay the effectiveness of the agency's approval unless the court shall otherwise specifically order. In any such action, the court shall review de novo the issues presented.

(B) In any judicial proceeding attacking a merger transaction approved under paragraph (5) on the ground

that the merger transaction alone and of itself constituted a violation of any antitrust laws other than section 2 of Title 15, the standards applied by the court shall be identical with those that the banking agencies are directed to apply under paragraph (5).

\* \* \* \* \* \*

Plaintiff contends that the merger violates Section 7 of the Clayton Act and that the affirmative offsetting factors stated in the Bank Merger Act are either not present or could be satisfied in a manner which would be less anticompetitive than the proposed merger. Defendants and intervenor disagree on both grounds.

Banking as an industry is subject to the same antitrust standards as other industries. Thus, a bank merger may not pass antitrust muster without surviving an analysis of its anticompetitive effects, if any, on the structure of the market involved. United States v. Third National Bank in Nashville, 390 U.S. 171, 181–182, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968); United States v. First City National Bank of Houston, 386 U.S. 361, 365, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967); United States v. First National Bank and Trust Company of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

In Philadelphia, supra, the second and third largest of forty-two commercial banks with head offices in the Philadelphia metropolitan area sought to merge and thereby to become the largest bank, controlling at least 30% of the commercial banking business, in that area. Noting the trend toward concentration in the area, Mr. Justice Brennan, for the majority, held in what he described as a case of "first impression" (at 337, 83 S.Ct. 1715) that bank mergers are subject to Section 7 of the Clayton Act and that the proposed merger violated Section 7 of the Clayton Act. Mr. Justice Harlan, dissenting from the application of the Clayton Act to the banking industry, noted (at 373, 83 S.Ct. at 1746) that the Bank Merger Act of 1960 resulted from congressional concern with "an apparently accelerating trend toward concentration in the commercial banking system in this country." The recognition of that general trend in commerce and industry as a whole had earlier supplied the "dominant theme" underlying the 1950 amendments to section 7 of the Clayton Act. Brown Shoe Company v. United States, 370 U.S. 294, 315, 82 S. Ct. 1502, 8 L.Ed.2d 510 (1962).

In United States v. First City National Bank of Houston,[2] supra, 386 U.S. at 365, 87 S.Ct. at 1091 Mr. Justice Douglas wrote:

Section 7 of the Clayton Act condemns mergers where "the effect of such acquisition may be substantially to lessen competition." The Bank Merger Act of 1966 did not change that standard \* \* \*.

And in United States v. Third National Bank in Nashville, supra, Mr. Justice White, for the majority, stated:

The legislative history of the Bank Merger Act of 1966 leaves no doubt that the Act was passed to make substantial changes in the law applicable to bank mergers. Congress was evidently dissatisfied with the 1960 Bank Merger Act as that Act was interpreted in United States v. Philadelphia National Bank \* \* \* and in United States v. First National Bank & Trust Co. of Lexington \* \* \* and wished to alter both the procedures by which the Justice Department challenges bank mergers and the legal standard which courts apply in judging those mergers. The resulting statute, however, as some members of Congress recognized, was more clear and more

2. Involving two proposed mergers—one between two Houston banks, the other (see, on remand from the Supreme Court, United States v. Provident National Bank, 280 F.Supp. 1 (E.D.Pa. 1968)) between two Philadelphia banks. In both cases, the District Courts dismissed the complaints; and in each the Supreme Court reversed and remanded.

specific in prescribing new procedures for testing mergers than in expounding the new standard by which they should be judged. [Footnotes omitted.] [390 U.S. at 177–178, 88 S.Ct. at 887].

\*   \*   \*   \*   \*   \*

We find in the 1966 Act, which adopted precisely that § 7 Clayton Act phrase, as well as the "restraint of trade" language of Sherman Act § 1, no intention to adopt an "antitrust standard" for bank cases different from that used generally in the law. Only one conclusion can be drawn from the exhaustive legislative deliberations that preceded passage of the Act: Congress intended bank mergers first to be subject to the usual antitrust analysis; if a merger failed that scrutiny, it was to be permissible only if the merging banks could establish that the merger's benefits to the community would outweigh its anticompetitive disadvantages. *See Houston Bank, supra.* [Footnote omitted.] [At 181–182, 88 S.Ct. at 887–889.]

■ The burden of proving the reasonable probability of a substantial lessening of competition is upon the Government as plaintiff. *See Philadelphia,* 374 U.S. at 363, 83 S.Ct. 1715. In *Houston,* the Court held that the defendant banks had the burden of proving "an anticompetitive merger is within the exception of 12 U.S.C. § 1828(c) (5) (B) \* \* \*," 386 U.S. *supra* at 366, 87 S.Ct. at 1092, and that both sets of issues—those presented by section 7 of the Clayton Act and those presented by the exception in the Bank Merger Act of 1966—are to be determined *de novo* by the courts using the identical standards which the regulatory agency, here the Comptroller, is directed by 12 U.S.C. § 1828 to apply. *See also* Nashville, *supra,* 390 U.S. at 178, 88 S.Ct. 828.

■ Both section 7 and the 1966 Act (*see* 12 U.S.C. § 1828(c) (5) (B)) speak of mergers whose effect *"may* be substantially to lessen competition" (emphasis supplied). The word "may" connotes reasonable probability, *see* United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 607, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), not an "ephemeral possibilit[y]." *Brown Shoe, supra,* 370 U.S. at 323, 82 S.Ct. 1502. The "reasonable probability" standard has been applied to the banking industry by the Supreme Court in *Lexington* [3] and in *Philadelphia* prior to congressional action in the Bank Merger Act of 1966, and has since been so applied by that Court in *Houston* and *Nashville* as well as by federal district courts in United States v. Phillipsburg National Bank and Trust Company, 306 F.Supp. 645 (D.N.J.1969); United States v. First National Bank of Jackson, 301 F.Supp. 1161 (S.D.Miss.1969); United States v. Provident National Bank, 280 F.Supp. 1 (E.D.Pa.1968); and United States v. Crocker-Anglo National Bank, 277 F.Supp. 133 (N.D.Cal.1967).

■ There is no requirement that "the [reasonably probable] anticompetitive power manifest itself in anticompetitive action" before section 7 can be called into play. Federal Trade Commission v. Procter & Gamble Co., 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303 (1967) (sometimes referred to as *Clorox*). All that is needed are objective indications of reasonably probable anticompetitive effect, see United States v. Penn-Olin Chemical Co., 378 U.S. 158, 174–175, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 560 (N.D.Ill.E.D.1968), though subjective indications of expected effect are sometimes significantly present and, if they are so present, are of course important. *See* United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).

3. United States v. First National Bank and Trust Company of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964), in which the Supreme Court enjoined the consolidation of two banking institutions both located in Lexington, Kentucky.

In *Nashville, supra,* the proposed merger would have joined the second and the fourth largest banks in Davidson County, Tennessee, the former, "one of the strongest and best managed banks in the Nation" (390 U.S. at 174, 88 S.Ct. at 885), the latter, possessing "a more checkered history and a less dynamic present" (at 175, 88 S.Ct. at 886). The Supreme Court, reversing the District Court, held (at 183, 88 S.Ct. 882) that "the tendency of the merger" was "substantially to lessen competition" in Nashville, and stated that the Nashville area had three large banks and one middle-sized bank, and that the merger, if permitted, would have caused the market share of the three largest banks to rise from 93% to 98%, would have given the new merged institution almost 40% of Nashville's banking business, and would have horizontally merged out of existence the smallest of the four institutions. With regard to the applicability of the offsetting convenience and needs factors established by the 1966 legislation, Mr. Justice White wrote (at 186–187, 88 S. Ct. at 891):

In *Philadelphia Bank* * * *, this Court, acting under the 1960 Bank Merger Act, rejected the relevance of the combined bank's ability to serve Philadelphia by making large loans that could otherwise only be obtained in New York. The Court found no statutory authorization for considering such a benefit in appraising the legality of a merger. Expressions in Congress during consideration of the 1966 Act suggest that one purpose of that Act was to give this factor, not previously relevant in appraising bank mergers, suitable weight in judging their validity. * * *

Congress was also concerned about banks in danger of collapse—banks not so deeply in trouble as to call forth the traditional "failing company" defense, but nonetheless in danger of becom-

ing before long financially unsound institutions. * * * The District Court drew no conclusion about the extent of the danger these conditions posed * * * [or] about the feasibility of curative measures short of merger * * *. [Footnotes omitted.]

Noting (at 188, 88 S.Ct. at 893) that the smallest of the Nashville banks (the smaller of the two involved in the proposed merger) had "problems which were primarily rooted in unsatisfactory and backward management," Mr. Justice White concluded (at 189–190, 88 S.Ct. at 893):

If the injury to the public interest flowing from the loss of competition could be avoided and the convenience and needs of the community benefited in ways short of merger but within the competence of reasonably able businessmen, the situation is radically different. In such circumstances, we seriously doubt that Congress intended a merger to be authorized by either the banking agencies or the courts. * * * [W]e think it was incumbent upon those seeking to merge in this case to demonstrate that they made reasonable efforts to solve the management dilemma of * * * [the smaller bank] short of merger with a major competitor but failed in these attempts, or that any such efforts would have been unlikely to succeed.

* * * [T]he Act requires * * that the "future prospects of the existing and proposed institutions" be appraised. * * * This test does not demand the impossible or the unreasonable. It merely insists that before a merger injurious to the public interest is approved, a showing be made that the gain expected from the merger cannot reasonably be expected through other means.[4] [Footnote added.]

4. *See also* the discussion in United States v. Provident National Bank, 280 F.Supp. *supra* at 20–26, in which the Court held (at 25) that the banks failed to meet the burden of proving that the proposed merger would have the probable effect of meeting the convenience and needs of the community and at best had proved only the possibility of same.

In United States v. Crocker-Anglo National Bank, 277 F.Supp. 133 (N.D.Cal. 1967), the fifth and the eighth largest commercial banks in California, with headquarters respectively in San Francisco and Los Angeles, sought to merge to form a statewide institution. There was no actual competition between the two banks; indeed, they had branch offices in only one common county out of fifty-eight counties in the State. The Court concluded that the two banks were not in actual competition (at 177–178) and remarked (at 183) that the Government's "main thrust" was that "the merger forecloses potential competition" because each of the banks could reasonably have been expected to expand *de novo* into the service area of the other and thus to have become competitive with the other. Dealing with that contention, the *Crocker* Court found (at 183) that "neither bank would have moved into the area of the other *de novo*; that it was neither desirable nor feasible to do so; and that even if they wanted to, the Comptroller would not have permitted any of the entries needed to create a statewide system."[5]

The issues presented in cases arising under section 7 of the Clayton Act concern (1) "section of the country," (2) "line of commerce," and of course principally (3) whether "the effect of the acquisition may be substantially to lessen competition." And (4) in bank merger cases, there is also the additional question of the applicability of the offsetting factors established by the Bank Merger Act of 1966. In this case, the first question presents no problem, and the second,

because of the facts in this case, is not of major import. The third and fourth questions probe directly into the core of the case.

All of the parties agree that the section of the country—and the only section —involved is Harford County. There is, however, a controversy in this case as to what constitutes "line of commerce." Plaintiff, maintaining that the absence of the phrase "line of commerce" in the Bank Merger Act of 1966 does not constitute any intention on the part of Congress "to alter the traditional methods of defining relevant markets in which to appraise the anticompetitive effect of a merger," points to Mr. Justice White's stated agreement with the District Court that "commercial banking * * * [in the county involved] was the relevant market for appraising this merger." United States v. Third National Bank in Nashville *supra* 390 U.S. at 182 n. 15, 88 S.Ct. at 889. Prior to *Nashville*, in *Houston, supra* 386 U.S. at 369 n. 1, 87 S. Ct. 1088, the Supreme Court, after noting the absence of the words, "line of commerce," in the 1966 statute, stated that it did not "reach or intimate" any conclusion as to whether the 1966 Act changed the concept in banking of the relevant market. Earlier, prior to the 1966 statute, in *Philadelphia, supra,* Mr. Justice Brennan wrote (374 U.S. at 356–357, 83 S.Ct. at 1737–1738):

* * * [T]he cluster of products (various kinds of credit) and services (such as checking accounts and trust administration)[6] denoted by the term "commercial banking," *see* note 5, *supra*,[7] composes a distinct line of com-

5. The *Crocker* Court also rejected (at 184–185) the applicability of the doctrines enunciated and applied in United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964), and United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), discussed *infra*.

6. *See* United States v. First National Bank and Trust Company of Lexington, *supra* 376 U.S. at 667 n. 3, 84 S.Ct. at

1034: "In view of our disposition of the case we find it unnecessary to determine whether trust department services alone are another relevant market."

7. In footnote 5 of the *Philadelphia* opinion, it is stated:

The principal banking "products" are of course various types of credit, for example: unsecured personal and business loans, mortgage loans, loans secured by securities or accounts receivable, automobile installment and con-

merce. Some commercial banking products or services are so distinctive that they are entirely free of effective competition from products or services of other financial institutions; the checking account is in this category. Others enjoy such cost advantages as to be insulated within a broad range from substitutes furnished by other institutions. For example, commercial banks compete with small-loan companies in the personal-loan market; but the small-loan companies' rates are invariably much higher than the banks', in part, it seems, because the companies' working capital consists in substantial part of bank loans. Finally, there are banking facilities which, although in terms of cost and price they are freely competitive with the facilities provided by other financial institutions, nevertheless enjoy a settled consumer preference, insulating them, to a marked degree, from competition; this seems to be the case with savings deposits. In sum, it is clear that commercial banking is a market "sufficiently inclusive to be meaningful in terms of trade realities." Crown Zellerbach Corp. v. Federal Trade Comm., 296 F.2d 800, 811 (CA9th Cir. 1961). [Footnotes other than 5 in *Philadelphia*, that is, 7 herein, omitted; footnote 6 added.]

The meaning of "line of commerce" was considered after *Philadelphia* and before *Nashville* in United States v. Crocker-Anglo-National Bank, *supra*. Judge Zirpoli, writing for a three-judge court, 277 F.Supp. at 153–162, deemed significant the omission of those three words from the Bank Merger Act of 1966 and also held that it was not proper to ignore what he termed (at 154) "the *totality of financial activities* carried on by *commercial banks* and *their competition* in a statewide market of the magnitude of California or in the national market," thus seemingly distinguishing such a market from a local market.[8]

*Crocker*, as indicated, involved a geographical merger,[9] albeit on a statewide

sumer goods installment loans, tuition financing, bank credit cards, revolving credit funds. Banking services include: acceptance of demand deposits from individuals, corporations, governmental agencies, and other banks; acceptance of time and savings deposits; estate and trust planning and trusteeship services; lock boxes and safety-deposit boxes; account reconciliation services; foreign department services (acceptances and letters of credit); correspondent services; investment advice. It should be noted that many other institutions are in the business of supplying credit, and so more or less in competition with commercial banks * * *, for example: mutual savings banks, savings and loan associations, credit unions, personal-finance companies, sales-finance companies, private businessmen (through the furnishing of trade credit), factors, direct-lending government agencies, the Post Office, Small Business Investment Corporations, life insurance companies. [374 U.S. *supra* at 326–327 n. 5, 83 S.Ct. at 1721–1722].

8. In United States v. Provident National Bank, 280 F.Supp. 1 (E.D.Pa.1968), Judge Clary, on remand from the Supreme Court in United States v. First City National Bank of Houston, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967), held violative of the Clayton Act the proposed merger of the fifth and seventh largest banks in the area under which the resulting institution would have become the fourth largest such institution (280 F.Supp. at 5). In so doing, Judge Clary, while commenting that the Supreme Court had left the "line of commerce" issue open in *Houston*, that the courts in *Nashville*, 260 F.Supp. 869, 878 n. 5 (M.D.Tenn.1966), and in *Crocker*, *supra*, had split over the significance of the omission of those words in the 1966 Act, and that the Supreme Court had noted probable jurisdiction in *Nashville* (388 U.S. 905, 87 S.Ct. 2111, 18 L.Ed.2d 1345 (1967)), expressed agreement with Judge Zirpoli in *Crocker*. That was, of course, before the Supreme Court filed its opinion in *Nashville*.

9. In United States v. First National Bank of Jackson, 301 F.Supp. 1161, 1190 (S.D.Miss.1969), the Court wrote:
   There are five types of mergers recognized today. The first is the "horizontal merger" which is a merger between two firms who are in direct

level. All other bank merger cases which have been brought to the attention of this Court are horizontal mergers between banks with headquarter offices in the same area—except for United States v. First National Bank of Jackson, 301 F.Supp. 1161 (S.D.Miss.1969), in which the issues are factually and legally closer to those in this case than are the issues in any other.[10] In *Jackson*, the Government, as in this case, concentrated its attacks upon the effect on potential competition, which the merger of the Bank of Greenwood, Mississippi into the First National Bank of Jackson, Mississippi could reasonably be expected to have upon commercial banking in Leflore County, Mississippi. The Jackson bank, the second largest bank in Mississippi, was "a full service, general and commercial bank and trust company" (at 1165) with its head office in Jackson and its twenty branch offices located within 100 miles of Jackson.[11] It did not operate in Leflore County. Greenwood, located in that county, lies about 94 miles from Jackson. The closest branch office of the Jackson bank to the Bank of Greenwood was approximately 50 miles. The latter

bank operated only one branch office, about three blocks from its home building. Chartered in 1933, when there was only one other bank then operating in Leflore County, the Bank of Greenwood grew rapidly and, in 1944 when a third bank was organized in the county, was transacting about sixty per cent (60%) of the county's banking business. At the end of 1964, the county's commercial bank deposit figures showed the Bank of Greenwood with about fifty-two per cent (52%) of total deposits in the county, the oldest bank with less than twenty per cent (20%), the newest bank with about twenty-two per cent (22%), and a branch office of a bank with its headquarters in Grenada, Mississippi,[12] holding about six per cent (6%). In 1965, a fifth commercial bank commenced operations in the county, after which the Bank of Greenwood's year-end deposits decreased to approximately forty-eight per cent (48%) in 1965, forty-seven per cent (47%) in 1966, forty-six per cent (46%) in 1967, and under forty-six per cent (46%) in June, 1968. Nevertheless, the Bank of Greenwood, at the time it entered into the merger agree-

competition, that is, producing the same product lines and operating in the same geographic markets. The second is the "vertical merger" which is a merger between two firms that have a buyer-seller relationship, that is, one produces a product that is then sold to the other. The third is the "product extension merger" which is a merger between two firms that are not direct rivals but each produces a product that is functionally related either in marketing or in production to the other. The fourth is a "geographic market extension merger" which is a merger between two firms that produce the same product line but do so in separate geographic markets and are not direct rivals. The fifth is a "pure conglomerate merger" which is a residual category in which all mergers are placed that do not fit anywhere else and in which there seems to be no functional or meaningful relationship between the firms involved * * *. Dr. Charles F. Peake, plaintiff's expert witness herein, testified almost identically at Tr. 133–35. "All mergers are

within the reach of § 7, and all must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate or other." Federal Trade Commission v. Procter & Gamble Company, 386 U.S. 568, 577, 87 S.Ct. 1224, 1229–1230, 8 L.Ed.2d 303 (1967) (Footnote omitted.) In that case, the acquisition was called "a product-extension merger" (at 570, 577. 87 S.Ct. 1224).

10. The Government did not appeal from the decision in *Jackson* in which the District Court refused to enjoin the merger.

11. Mississippi allows branch banking only within a radius of one hundred miles of the parent bank. Miss.Code Ann. § 5229 (1942).

12. Grenada lies northeast of Greenwood and about as far in that direction from Greenwood as Jackson is to the southeast from Greenwood. The Grenada-headquartered bank was the only bank operating in Leflore County which did not have its parent office in that county.

ment with the Jackson bank, was the largest of the four commercial banks headquartered in Leflore County and the fifteenth largest Mississippi bank. Judge Nixon found (at 1167) that the "merger would result in a substantial additional number of services * * * to the residents of Leflore County that could not be provided by a smaller bank such as * * * [the Bank of Greenwood], including trust services, special services, consumer services, substantial increase in the lending limits to any one individual or entity, * * *." Judge Nixon also found (at 1168) the State of Mississippi to be a "capital deficit state" —a state whose "citizens do not generate savings in sufficient quantity to produce capital resources, but have to consume most of their income."

As in the case at bar, the determination of the relevant "section of the country" was not disputed in *Jackson*, all parties therein agreeing that it was Leflore County. The appropriate "line of commerce" was not, however, so agreed in *Jackson* or in this case. Reviewing the pronouncements of the Supreme Court in *Philadelphia* and in *Nashville*,[13] of the *Crocker* Court, and of Judge Clary in *Provident* (at 1179–1181), Judge Nixon found (at 1181) that certain other institutions "have been and are actually, directly, realistically, meaningfully and fiercely competitive with commercial banks in the Leflore County market" and concluded that "the relevant line of commerce" in that county "was broader than commercial banking." Judge Nixon emphasized (at 1181) that were he to confine "line of commerce" to commercial banking, his findings and

holding would in no way be altered; warned (at 1189) that "[c]oncentration ratios therefore must be applied to banking [into which, because of government regulation, there is no free entry] with great circumspection, [and] with particular appreciation of the history of commercial banking and the nature thereof"; noted (at 1190) that when a geographical market extension merger occurs, concentration remains unchanged and that the type of merger "differs substantially from the horizontal merger in which one firm in the market is removed"; and, quoting an expert witness, ·wrote that this type of merger—

> * * * can result in a firm of substantial size, both absolutely and relative to the industry involved, that is, the firm resulting from such a merger is not as dependent upon its performance in any particular geographic market as its more localized rivals might be, and this is the most important and significant aspect of this type merger, namely, its possible effect on potential competition * * *.

Judge Nixon concluded, *inter alia*, that the Jackson bank was not a probable potential *de novo* entrant into Leflore County, and that the merger itself would not create barriers to entry into that county by others, noting the existing barriers inherent in "its relatively low population," its declining economy, and the grave uncertainty of the future of its economic base" (at 1207–1208).[14] The Court in *Jackson* also found that the merger fulfilled the needs of Leflore County for greater lending limits and for trust and various specialized serv-

---

13. Judge Nixon concluded (at 1181) that the Supreme Court's agreement in *Nashville* with the District Court, that commercial banking was the "line of commerce," was "an affirmation of the trial court's determination that, under the *particular* facts and circumstances of that case, commercial banking was the appropriate line of commerce within which to measure the impact or anticompetition effects, if any, of the proposed merger therein," and expressed the belief that

"the Supreme Court would * * * [agree with him that] commercial banks must not be placed in a distinct and separate category to the exclusion of any and all other financial institutions which *actually* are competing *substantially* with commercial banks in various important or integral activities within the relevant geographic market."

14. In the case at bar, Harford County's economic base is healthy, not failing.

ices [15] which were not sufficiently available before the merger, and that the convenience and needs served by the proposed merger both outweighed and overwhelmed (using "overwhelmed" as Judge Clary did in *Provident* as well as the weaker word "outweighed"—the latter word appears in the 1966 Act) "the anticompetitive effects ascribed to this merger by the Justice Department" (at 1222). Finally, Judge Nixon, noting (at 1228) that Leflore County is "overbanked," found *de novo* entry by the Jackson or any other outside bank unlikely [16] and that there was no available alternative to a merger within the standards set forth by Mr. Justice White in *Nashville*. Thus, in *Jackson*, the Court reached the conclusion that the merger did not violate section 7 of the Clayton Act and that, if it did, the merger affirmatively met the offsetting tests of the 1966 legislation.

15. Including "consumer loan expertise, commercial loan expertise, a foreign services department, petroleum department, public housing assistance, municipal bond expertise, qualified business advice, student loans, farm services, and broad nationwide contacts." United States v. First Natioal Bank of Jackson, *supra* 301 F.Supp. at 1215.

16. In so doing, Judge Nixon considered the question of whether the Jackson bank was a "probable potential competitor of the Greenwood bank" (at 1190–1191) under the standards of United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964), and United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed. 2d 12 (1963).

17. Earlier (at p. 647), Judge Shaw wrote: While the term "commercial banking" may be used as a general description of a line of commerce in bank merger cases, a detailed analysis of all of the competitive banking services offered to the public by the merging banks is necessary in each case. Areas of substantial and effective competition in the market in which the merging banks operate are not necessarily the same in each case. As the Supreme Court noted in *Philadelphia*, supra, "Some commercial banking products or services are so distinctive that they are entirely free of effective competition from

United States v. Phillipsburg National Bank and Trust Company, et al., 306 F.Supp. 645 (D.N.J.1969), involved a proposed horizontal type merger of two banks with headquarters in Phillipsburg, New Jersey. Judge Shaw wrote (at p. 650 of the opinion):

\* \* \* It seems to the Court that the better approach in defining the line of commerce is to single out those products and services which are not only unique to commercial banking, but also those where the banks in the relevant geographic market are directly and effectively competitive. \* \* The Court concludes that the appropriate line of commerce in this particular case should consist of those products and services labeled as checking accounts, savings accounts, certificates of deposit, personal loans, consumer installment loans, and commercial and industrial loans. \* \* \* [17] [Footnote added.]

products or services of other financial institutions; the checking account is in this category." Id., 374 U.S. at 356, 83 S.Ct. at 1737. To the extent that a bank offers substantial banking services in effective competition with other banks and other financial institutions, the effect of a merger upon such competition, regardless of the source, must be considered. It is the line of commerce consisting of products and services offered which must be examined.

This requires a comparison of the products and services offered by competing banks and other financial institutions operating in the market so that the areas of distinct and effective competition may be delineated. Where, for instance, the competition is not substantial or effective, that circumstance is a factor to be weighed in the evaluation of probable lessening of competition. But, on the other hand, where a bank is rendering a substantial banking service in effective competition with competing banks and other financial institutions, the effect of a lessening of present or imminently potential competition cannot be ignored in giving effect to Section 7 of the Clayton Act. In this case it seems from the record before the Court that in many of the banking services offered by the defendant banks there is very virulent and widespread competition from other banks and other financial institutions. The merger

As did the district courts in *Crocker, Provident* and *Jackson,* this Court concludes that the definition of "line of commerce" in no way controls the disposition of any of the issues in this case. Nevertheless, the concept of "line of commerce" is not without importance herein. To begin with, guidelines for sifting and weighing "relevant economic data" in cases of this kind—data which Mr. Justice Brennan in *Philadelphia* (374 U.S. at 362, 83 S.Ct. 1715) most aptly described as "both complex and elusive"—are sorely needed by litigants, lawyers and courts, particularly trial courts. The trick is to provide the radar helpful in landing the plane without imposing on the pilot the obligation of utilizing the same landing approach in each given instance in precisely the same manner. In this case, the principal business of the commercial banks headquartered and doing business in Harford County is accumulation of deposits (more time than demand) and the making of loans which county-type banks customarily make, i. e., mostly small or medium-sized local real estate, small business and consumer loans. Those banks are in direct competition for · a great deal of that business with savings banks in Baltimore City, or with building and loan associations as well as other financial institutions (Tr. 399–402) in and out of Harford County. To put blinders on and to ignore those facts would result in this Court attempting to assess present and potential commercial banking competition in Harford County in a vacuum. And yet there may well be merit to the position of plaintiff's counsel that, if "line of commerce" is broadened to include other than "commercial banking" as such—that is,

* * * [i]f you diluted your universe that much, you would probably get these percentages down so low that you would never have a susbtantial effect. If you take all savings and loans, all building and loans, all finance companies, all small loan outfits * * * [and consider them as competitors within the market,] you would run into the substantiality problem. [Tr. 911–12].

In other words, if financial institutions other than commercial banks are included, the percentage participations of commercial banks before and after the merger might become meaningless figures. Thus, it may be necessary, in order not to destroy the usefulness of some of the significant guidelines which have been developed, to confine "line of commerce" to commercial banking but, at .the same time, in order to take into account the relevant facts of life, to consider the activities of financial institutions other than commercial banks as such, in determining whether the effect of an "acquisition may be substantially to lessen competition, or to tend to create a monopoly." In that way, those noncommercial bank activities can be taken into account in connection with the effect of the merger upon commercial banking as the line of commerce in the given market. But, in the light of the facts of this case, even if the blinders are put on and the activities of all financial institutions other than commercial banks are completely disregarded both with regard to definition of "line of commerce" and the expected effect upon competition, the findings and holdings of this Court would not vary in any way in result or in degree.

would have no substantial anticompetitive effect upon such services. The most significant of these services may be classified as time and savings deposits, conventional real estate loans, and financing of automobiles, appliances and business equipment. The demand deposit or checking account is a distinct commercial bank-

ing service free from competition except in the banking industry. In a lesser degree the same is true of short- and long-term commercial and industrial loans. Trust services offered are so insignificant that defendant banks cannot be presently considered as competitive in that field.

First of Maryland is the second largest commercial bank in Maryland, ranking second only to Maryland National Bank. Like the latter, and the other three members of the "big five" Baltimore City headquartered banks, namely, the Equitable Trust Company, the Union Trust Company and the Mercantile-Safe Deposit and Trust Company, First of Maryland has its principal office in downtown Baltimore City. Prior to 1962, it was primarily a Baltimore metropolitan area bank with all of its offices in Baltimore City and adjacent Baltimore and Anne Arundel counties. Since then, it has expanded into a number of counties and has forty-two bank offices.[18] First of Maryland has approximately $534 million of deposits, which is about 14% of the State's commercial bank deposits, and assets of about $646 million. By contrast, First of Harford has about $30 million of deposits and about $37 million of assets (Stipulation A).

Harford County lies northeast of Baltimore City. The interstate highways between Baltimore, Maryland, and Wilmington, Delaware run through its southern portion. The county is, roughly, bounded by the Chesapeake Bay to the south, the Susquehanna River to the east, the State of Pennsylvania to the north, and Baltimore County to the west. It has no one major population center; rather, its residential and business concentrations are in Bel Air, Aberdeen, Havre de Grace, Edgewood, and Joppatown (Tr. 600–04, 606–07), all of which lie in the southern part, between forty miles in the case of Havre de Grace and twenty-five miles in the case of Joppatown from downtown Baltimore City. Havre de Grace, in the county's southeastern corner, is hemmed in by the Sus-

quehanna River, the Chesapeake Bay and the two interstate routes, the Kennedy Expressway and U. S. Route 40. Aberdeen and Edgewood lie along or close to those highways; Joppatown lies south of them in the southwest corner; and Bel Air, the county seat, is located somewhat to the north of the two highways in the eastern central part. There is no one central cluster of business or population in Harford County—nor any one highway along which lies Bel Air, Aberdeen, Havre de Grace, Edgewood, and Joppatown, and several other smaller population clusters (Tr. 821). The Kennedy Expressway bursts the traveller through the county almost while he listens to the hourly news on his car radio. Route 40 takes him through Aberdeen, and both routes are within minutes in terms of safe driving time from each of the abovementioned towns and the industrial complex which has developed in the southern part of the county. None of those five towns dominates any of the others. And none provides for a bank customer whose home base is located at one of the others the same "convenience of location" which is offered at his home base. "In banking, as in most service industries, convenience of location is essential to effective competition. Industries and corporations typically confer the bulk of their patronage on their local community; they find it impractical to conduct their banking business at a distance." *Philadelphia, supra* 374 U.S. at 358 (footnote omitted), 83 S.Ct. at 1738. *And see* Tr. 690.

All of the twenty-five banking offices in the county are located in or near one of the above-named five places, except for one in Forest Hill and one in Jarrettsville, both of which lie north of Bel Air; one in Churchville, which is east and north of Havre de Grace and west of

---

18. Equitable has 59; Maryland National, 87; Union Trust, 48 (Tr. 244).

Bel Air; and one in Darlington, in the northeast section of the county.

Eight banks operate twenty-four bank offices in the county: [19]

| Name of Bank | Home Office in County | Number of Branches | Location | Ranking in Terms of Assets | Ranking in Terms of Total Deposits | Ranking in Terms of Total Loans |
|---|---|---|---|---|---|---|
| Aberdeen National Bank | 1 | 0 | Home: Aberdeen | 8th | 7th | 8th |
| Citizen National Bank of Havre de Grace | 1 | 1 | Home: Havre de Grace Branch: Havre de Grace (drive-in office) | 7th | 6th | 7th |
| Commercial and Savings Bank | 1 | 2 | Home: Bel Air Branches: Edgewood (outside U. S. Army post); Edgewood (on that post) | 4th | 3rd with about 20% | 3rd |
| First National Bank of Harford County | 1 | 4 | Home: Bel Air Branches: Bel Air (shopping center); Bel Air (drive-in office); Edgewood (shopping center); Aberdeen | 3rd | 1st with about 32% | 2nd |
| First National Bank and Trust Company | 1 | 2 | Home: Havre de Grace Branches: Havre de Grace (drive-in office); Churchville | 5th | 4th with about 12% | 4th |

19. The Equitable Trust Company has filed applications for the approval of two additional branches. If they are opened, there will be 26 bank offices in the county.

The drive-in offices offer mainly deposit and check-cashing facilities; the Army post (Tr. 88 and 603) and Bata Shoe offices (Tr. 548–51) are principally for servicing of personnel employed on the bases and in the shoe factory and also in the case of Bata, the company itself.

All figures and percentages, referred to in this opinion, unless otherwise indicated, were as of June or December, 1968; their approximate accuracy was stipulated to by all parties.

| Name of Bank | Home Office in County | Number of Branches | Location | Ranking in Terms of Assets | Ranking in Terms of Total Deposits | Ranking in Terms of Total Loans |
|---|---|---|---|---|---|---|
| Forest Hill State Bank | 1 | 1 | Home: Forest Hill<br>Branch: Jarrettsville | 6th | 5th | 5th |
| Union Trust Company | 0 | 1 | Home: Balti-more City<br>Branch: Belcamp (at Bata Shoe plant) | 2nd | 8th | 6th |
| Equitable Trust Company | 0 | 7 (plus two applica-tions pending)* | Home: Balti-more City<br>Branches:<br>Aberdeen (main office in Harford County);<br>Aberdeen (drive-in office);<br>Aberdeen Proving Ground (Army post); Aberdeen (shopping center);<br>Darlington (in northeastern section of the county (Tr. 40));<br>Joppatown (shopping center); Bel Air (shopping center)<br>*Churchville (shopping center);<br>*Campus Hills (shopping center between Bel Air and Aberdeen) | 1st | 2nd with about 20% | 1st |

The State of Maryland is composed of 24 political subdivisions: Baltimore City (an entity unto itself) and 23 counties. It has a total population of 3.76 million persons. Harford County, with 108,000, ranks sixth behind Baltimore City—909,000; Prince George's County—613,-200; Baltimore County—592,000; Montgomery County—464,600; Washington County—108,800.

Fifteen states, including Maryland, plus the District of Columbia permit statewide branch banking. Maryland ranks eleventh in terms of deposits per banking office, with $7.6 million per banking office against a fifteen-state average of $10.2 million per banking office. In terms of accounts per branch banking office, Maryland ranks tenth, with 4796 against a fifteen-state average of 6267.

Harford County has an average of 4696 persons per banking office as against the Maryland average of 6494 persons per banking office. Harford, while sixth in rank in terms of total pop-

ulation per county, is twelfth in rank in terms of population per banking office per county.[20]

If, as anticipated, Harford County's population increases by 1985 from 108,-000 to 168,000 persons (Tr. 260),[21] and no more banking offices other than Equitable's two new ones are opened, there will be 6462 people per banking office in Harford County in 1985.

In terms of deposits per banking office, Harford County ranks nineteenth among Maryland's counties, with $4.36 million against, as noted above, a Maryland statewide average of $7.6 million.[22]

The ratio of time and savings deposits to total deposits in the Fifth Federal Reserve District (District of Columbia, Maryland, Virginia, West Virginia, North Carolina, and South Carolina) is between 52% and 54.5%. In Harford County, the ratios of the time and savings deposits of the eight banks vary from a low of about 55% to a high of about 67%, except for the Union Trust Company ratio which has less than 10% of time deposits. Yet even with Union Trust figured in, the county-wide average ratio is about 60%. During the last several years, there has been a shift toward a higher percentage of time and savings deposits to total deposits. This increase has taken place while total deposits have increased in the county (Tr. 444). Federal Reserve figures reveal that time and savings deposits are considerably less profitable for a bank than demand deposits, a fact which is self-evident, since the former deposits earn interest for the customer and demand deposits do not.

The average ratio of mortgage loans to total loans of the eight banks operating in Harford County is about 47%, varying from a 34% low for First of Harford to an 80% high for Commercial and Savings Bank. The Union Trust experience at Belcamp was atypical, i. e., .005010% (Stipulation B, ¶ 65). First of Harford has the largest lending limit, i. e., slightly less than $200,000 (Tr. 308), of any bank in Harford County other

20. The figures reveal the following:

| Persons per Banking Office | |
|---|---|
| Baltimore City | 10,213 |
| Baltimore County | 8,470 |
| Anne Arundel County | 8,418 |
| Prince George's County | 7,478 |
| Montgomery County | 6,278 |
| St. Mary's County | 6,257 |
| Howard County | 6,133 |
| Allegany County | 5,840 |
| Charles County | 5,337 |
| Cecil County | 5,027 |
| Calvert County | 4,700 |
| Harford County | 4,696 |
| Washington County | 4,533 |
| Dorchester County | 4,171 |
| Somerset County | 3,860 |
| Frederick County | 3,500 |
| Wicomico County | 3,112 |
| Queen Anne's County | 3,000 |
| Caroline County | 2,871 |
| Carroll County | 2,835 |
| Worcester County | 2,382 |
| Garrett County | 2,218 |
| Talbot County | 2,200 |
| Kent County | 1,950 |

21. If, as another estimate indicates (Tr. 257–61), the population of the county increases to 200,000 persons by 1985, and no additional offices other than Equitable's two are opened, there would be slightly less than 7700 people per office in that year in the county.

22. The breakdown is as follows:

| | Total Deposits per Banking Office |
|---|---|
| Baltimore City | 18,314 |
| Prince George's County | 7,316 |
| Charles County | 6,895 |
| Montgomery County | 6,854 |
| Allegany County | 6,725 |
| Dorchester County | 6,580 |
| Frederick County | 6,241 |
| Washington County | 5,480 |
| Baltimore County | 5,388 |
| Carroll County | 5,124 |
| St. Mary's County | 5,113 |
| Talbot County | 4,962 |
| Wicomico County | 4,939 |
| Calvert County | 4,832 |
| Worcester County | 4,799 |
| Somerset County | 4,651 |
| Cecil County | 4,394 |
| Anne Arundel County | 4,359 |
| Harford County | 4,359 |
| Caroline County | 4,354 |
| Kent County | 4,224 |
| Queen Anne's County | 3,809 |
| Howard County | 3,668 |
| Garrett County | 3,615 |

than Equitable and Union. First of Harford and some of the other local banks are close to "loaned up." (Tr. 88, 311, 380, 383, 451–52). The lending limit of First of Maryland is $3,750,000, and that of Equitable, $2,750,000 (Tr. 308). First of Maryland presently has many millions of dollars available under its limit (Tr. 311). Officials of each of the county banks—some called by plaintiff, others by defendants or by intervenor—testified unanimously that there is a pronounced shortage of lendable funds in the county (Tr. 67, 75–77, 85–89, 178; Leutkemeyer Deposition 20; Snodgrass Deposition, 56). Their testimony was augmented by statistical exhibits, by expert opinion and by testimony of officials of lending institutions located in and out of the county, and of Harford County businessmen, lawyers and officials, that Harford County's residential and business mortgage fund requirements are significantly supplemented by funds from financial sources other than the eight commercial banks operating in Harford County, namely, from Baltimore City's institutions and from institutions other than commercial banks in Harford County, including the twelve Harford County savings and loan associations (Tr. 868–89). Further, it is clear that the lending limits (Tr. 386) of the local Harford County commercial banks cannot come close to accommodating a significant portion of the borrowing needs [23] of Harford County's manufacturers, automobile dealers, building contractors, road contractors, shopping center owners, churches and others (Tr. 398, 573; Snodgrass Deposition, 56–59) with the sole exception of the Equitable and Union Trust companies.[24] Similarly, except for Equitable, no commercial bank operating in Harford County offers a complete line of big city commercial banking services encompassing trusts services for individuals or business concerns (including profit-sharing and pension trust facilities), computerized payof the county-type bank simply does not roll and other computer services, large scale receivable and inventory financing, automobile floor planning, international banking services, and comprehensive, sophisticated financial advice to expanding businesses. (Tr. 89–90, 176, 209, 309–22, 344, 365–66, 392–93, 518, 594–99, 669, 686–87, 755).[25] The Harford County based banks are county banks whose services, attitudes and training are needed by many of its residents and small businessmen who require certain types of loans and services [26] and are seemingly, presently well cared for on a plane which features personal knowledge of real estate values and personal interest in the individuals involved (Tr. 378,

23. The president of the Forest Hill State Bank testified (Tr. 67) :
  If it weren't for the Baltimore institutions, why, the development in Harford County wouldn't be 50 per cent what it is presently. There is a distinct shortage of loanable funds. We turn them down every day.

24. Baltimore City's banks engage in some participation loans with Harford County banks, but participation arrangements lead to delays and are not popular with bankers or their customers, both of whom prefer to deal with persons they know, sitting on the other side of the desk, rather than with complete or relative strangers whom they know only or principally through the middle man, i. e., the county bank. In addition, a bank likes to lend to persons who keep deposits with it, thus enabling it to make more loans from the expanding deposit base, and this means that the beneficiary of a participation loan may be required to split his deposits between his own bank and the participating bank, which neither he nor his own bank likes (Tr. 81–82, 394–95).

25. The Union Trust Company's single Harford County office, while open to the public, is in effect a captive Bata Shoe office and has little or no impact upon the county's commercial banking services, strengths and weaknesses (Tr. 538, 548–51).

26. Including conventional small business and residential mortgages, other small business and consumer loans, and services such as checking accounts, savings accounts, certificates of deposit, Christmas Club plans, safe-deposit boxes, travellers checks, bank money orders, cashier and certified checks, and E Bonds (Tr. 370–71, 375–77).

681–82). But many Harford County businesses and individuals also require that wide range of services which a county-type bank is not equipped and cannot afford to give. The deposit base permit the expense involved in hiring, training and maintaining large staffs of specialists in the many subdivisions of modern, all service commercial banking. And Harford County, lying in the middle of the Boston-Richmond megalopolis of the not too distant future, has more and more need every day for the participation and advice of such specialists.

On the other hand, when it comes to deposits, the county is over-banked. Not only the bare statistics but the testimony of each of the home-headquartered Harford County bankers support that conclusion (Tr. 78, 79, 293)—each of them is opposed to more branches for anyone except for the possibility of one near the Pennsylvania border which First of Harford is contemplating (Tr. 607). Equitable, it is true, is aggressively pursuing an expansion policy as it seeks to open branch offices, and to increase its deposit base to support the rendition of the services of a large city bank in key spots in the county.

Plaintiff contends that the Harford County banking market is presently highly concentrated (Tr. 269–74, 280–83) and dominated by oligopolistic rather than by competitive pricing. As shown above, the Harford County banks have a very high percentage of time deposits and mortgage loans, for both of which they compete with many other financial institutions. But even if that fact is disregarded,[27] the fact that First of Harford and Equitable have about 52% of the total commercial bank deposits of the eight banks operating in the county and that these two banks, together with two others, have about 85% of such deposits, does not in and of itself show that the market is not competitive. Percentages do not in and of themselves tell the entire story, as a glance at the

following table of deposits of the two largest and the four largest banks in each of the counties of Maryland reveals:

| County | 2 Largest | 4 Largest |
|---|---|---|
| Calvert | 100% | ----- |
| Garrett | 93% | ----- |
| Somerset | 85% | ----- |
| St. Mary's | 82% | ----- |
| Talbot | 77% | 100% |
| Allegany | 71% | 88% |
| Charles | 70% | 100% |
| Prince George's | 69% | 81% |
| Frederick | 66% | 85% |
| Kent | 63% | 99% |
| Howard | 61% | 87% |
| Caroline | 59% | 86% |
| Queen Anne's | 57% | 94% |
| Cecil | 57% | 85% |
| Dorchester | 56% | 100% |
| Wicomico | 53% | 81% |
| Harford | 53% | 86% |
| Anne Arundel | 52% | 76% |
| Washington | 51% | 81% |
| Baltimore City | 50% | 88% |
| Montgomery | 50% | 70% |
| Worcester | 49% | 71% |
| Carroll | 49% | 70% |
| Baltimore County | 47% | 83% |

Many American communities have only one or two banks. With regard to such communities, it is meaningless to conclude, unless other compelling factors are present, that monopolies, duopolies, or oligopolies exist. (Tr. 889–90). Indeed, the structure of our banking industry is designed to prevent undue fragmentation. "But while fragmentation of the market as opposed to concentration is still favored, it is clear that Congress did not intend to emphasize fragmentation to that point *in the banking industry* where there would be substantial detriment to the consumer." Phillipsburg, *supra* 306 F.Supp. at p. 667. (Emphasis in the original.) Free entry into banking in any area is not permitted. The requirement of prior govern-

---

27. *See* the discussion, *infra*, re "line of commerce."

mental approval, in and of itself, brings about a lesser number of branch offices than one would expect to find in operation in a totally unregulated industry. And in turn, the need to insure the financial health of each bank and the security of its deposits has led the governmental regulatory authorities to place limitations upon the number of branch offices. Further, competition is curtailed by the ceiling placed by Regulation Q of the Federal Reserve System upon interest payments on time deposits (Tr. 689, 738, 818), as well as by state laws limiting interest charges on loans. Finally, because of F.D.I.C. insurance on deposits and automated services which provide the same type of bank statements and accounting services in small as well as large banks, customers tend to look on all banks as equal when they seek a bank merely for use as a depository.

Against this background, while percentage figures, such as those showing two banks controlling about 52% of Harford County's deposits and four banks controlling approximately 85% of its deposits, deserve careful scrutiny, they do not, in and of themselves, constitute absolute legal standards which compel any given result. Congress has not provided "quantitative or qualitative tests by which enforcement agencies * * * [can] gauge the effects of a given merger to determine whether it may 'substantially' lessen competition or tend toward monopoly." *Brown Shoe, supra* 370 U.S. at 321, 82 S.Ct. at 1522. It may well be that in big city markets like Philadelphia or Houston or Nashville, or in markets like Lexington, Kentucky or Phillipsburg, New Jersey, certain percentage figures will lead to one conclusion or another just as percentages varying from thirty per cent (30%) to sixty per cent (60%) in Federal Trade Commission v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); United States v. Ingersoll-Rand Co., 320 F.2d 509 (3d Cir. 1963); Reynolds Metal Co. v. Federal Trade Commission, 114 U.S.App.D.C. 2, 309 F.2d 223 (1962); and United States v. Wilson Sporting Goods Co., 288 F.Supp. 543 (N.D. Ill.E.D.1968), added up to proof of market dominance in those cases. But those conclusions can only be reached in each individual case after examination of its respective facts. "There is no precise percentage of market control or increase in concentration which can be used as a guide. The decision in each case must turn upon the particular facts in that case." *Phillipsburg, supra*, 306 F.Supp. at p. 655.

■ In Harford County, the current competition for deposits among the existing commercial banks is intense—and present competition among customers for loans from those banks is just as great if not greater. Competition reigns supreme except in connection with those "big city bank" services which Equitable alone currently offers. Thus, the Harford County banking market cannot be characterized as noncompetitive or tending toward monopoly or oligopoly (Tr. 689, 818–20, 836) and thus is different from the markets in Federal Trade Commission v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed. 2d 303 (1967); United States v. Penn-Olin Chemical Co., 378 U.S. 158, 175, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), discussed *infra*, and in the four bank cases which have reached the Supreme Court, *Philadelphia, Lexington, Houston* and *Nashville*. That difference is most revealing. For while a merger may have proscribed anticompetitive effects in a market which is competitive prior to the merger, it is more likely to run afoul of antitrust standards when the market is already lacking in competition at the time of the merger.

In *Philadelphia*, Mr. Justice Brennan wrote (374 U.S. at 363, 83 S.Ct. at 1741) that:

* * * a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market

is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects. * * *

In this case, plaintiff concedes that this merger will not immediately cause any change in the degree of concentration in the county (Tr. 274), although First of Maryland admits that since it will offer a wider range of services than First of Harford and expects substantially to increase the current loan total of First of Harford, some increase in deposits will probably result (Tr. 343). However, plaintiff sets forth a number of independent contentions why this merger may be expected substantially to lessen competition in the future. To a great extent, those claims find their roots in United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), and United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964).

*El Paso* involved a merger between El Paso Natural Gas Co. (El Paso) and Pacific Northwest Pipeline Corporation (Pacific). El Paso, the sole non-California supplier of natural gas, furnished more than 50% of all natural gas consumed in that state, the remainder coming from intra-California sources. Prior to the merger, El Paso and Pacific had unsuccessfuly tried to arrange a joint program under which, *inter alia,* El Paso's California market would have become essentially protected from future competition. After that unsuccessful attempt and before the merger, Pacific came close to negotiating a contract to meet the needs of Southern California Edison Company, an important El Paso customer, but El Paso managed to keep its customer by reducing its price.

In *El Paso*, it was undisputed that the "line of commerce" was the production, transportation and sale of natural gas and that the "section of the country" was California. The dispute concerned the potential effect of the merger upon future competition. The Supreme Court

ordered El Paso to divest itself of Pacific, noting that Pacific was a potential entrant into California and that its "mere efforts * * * to get into the California market, though unsuccessful, had a powerful influence on El Paso's business attitudes" (376 U.S. 659, 84 S.Ct. at 1048). The Court also commented upon the regulated nature of the industry, the heavy capital outlay necessary to enter it, the few companies competing within the California market, and the "opportunities * * * for Pacific * * * had it remained independent" (at 661, 84 S.Ct. at 1049).

In *Penn-Olin*, Pennsalt Chemicals Corporation (Pennsalt) and Olin Mathieson Chemical Corporation (Olin Mathieson) jointly formed Penn-Olin Chemical Company to produce and sell sodium chlorate in the southeastern United States. The parties agreed that the chemical, sodium chlorate, was the line of commerce, and that the relevant market was the southeastern part of the United States. Three companies were engaged in producing sodium chlorate in the United States. The trial court found that two of them held over 90% of that market and thus "had a virtual monopoly" (378 U.S. at 163, 84 S.Ct. 1710). Pennsalt, the third company, had a bit less than 9% of that market. Mr. Justice Clark, writing for the majority, noted (at 172, 84 S.Ct. 1710) that the District Court had found that each company had the resources and general capacity necessary to construct its own sodium chlorate plant in the southeastern part of the United States, and profitably to compete in that market "if it had wished." The District Court had found it "impossible to conclude that as a matter of reasonable probability *both* * * * [companies] would have built plants in the southeast if Penn-Olin had not been created." (At 173, 84 S.Ct. at 1718) (Emphasis added.) Mr. Justice Clark held, however, that "the sole test" was not the probability that both companies would have entered the market, and that consideration had to be given to the probability that one of them would have so

entered, and also to whether the formation of Penn-Olin had eliminated potential competition "that might have remained at the edge of the market, continually threatening to enter" (at 173, 84 S.Ct. at 1718). Mr. Justice Clark wrote (at 174, 84 S.Ct. at 1719): "The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated," and noted the interest which the dominant companies in the market had taken in the proposed venture by Olin Mathieson and Pennsalt.

In remanding the case for further proceedings in the trial court, Mr. Justice Clark, for the majority, wrote (at 174–176, 84 S.Ct. at 1719):

Here the evidence shows beyond question that the industry was rapidly expanding; the relevant southeast market was requiring about one-half of the national production of sodium chlorate; few corporations had the inclination, resources and know-how to enter this market; both parent corporations of Penn-Olin had great resources; each had long been identified with the industry, one owning valuable patent rights while the other had engaged in sodium production for years; each had other chemicals, the production of which required the use of sodium chlorate; right up to the creation of Penn-Olin, each had evidenced a long-sustained and strong interest in entering the relevant market area; each enjoyed good reputation and business connections with the major consumers of sodium chlorate in the relevant market, i. e., the pulp and paper mills; and, finally, each had the know-how and the capacity to enter that market and could have done so individually at a reasonable profit. Moreover, each company had compelling reasons for entering the southeast market. Pennsalt needed to expand its sales to the southeast, which it could not do economically without

a plant in that area. Olin was motivated by "the fact that [it was] already buying and using a fair quantity [of sodium chlorate] for the production of sodium chlorate and that [it was] promoting the Mathieson process of the generation of chlorate dioxide which uses sodium chlorate." Unless we are going to require subjective evidence, this array of probability certainly reaches the prima facie stage. As we have indicated, to require more would be to read the statutory requirement of reasonable probability into a requirement of certainty. This we will not do.

However, despite the strong circumstances, we are not disposed to disturb the court's finding that there was not a reasonable probability that both Pennsalt and Olin would have built a plant in the relevant market area. But we have concluded that a finding should have been made as to the reasonable probability that either one of the corporations would have entered the market by building a plant, while the other would have remained a significant potential competitor. * *

Dissenting, Mr. Justice Douglas, joined by Mr. Justice Black, saw no need for the remand, noting (at 182, 84 S.Ct. at 1722–1723):

We do not, of course, know for certain what would have happened if the "joint venture" had not materialized. But we do know that § 7 deals only with probabilities, not certainties. We know that the interest of each company in the project was lively, that one if not both of them would probably have entered that market, and that even if only one had entered at the beginning the presence of the other on the periphery would in all likelihood have been a potent competitive factor. Cf. United States v. El Paso Natural Gas Co., 376 U.S. 651, 661, 84 S.Ct. 1044, 12 L.Ed.2d 12. We also know that as between Pennsalt and Olin the "joint venture" foreclosed all future competition by dividing the market fifty-fifty. That could not

have been done consistently with our decisions had the "joint venture" been created after Pennsalt and Olin had entered the market or after either had done so. To allow the joint venture to obtain antitrust immunity because it was launched at the very threshold of the entry of two potential competitors into a territory is to let § 7 be avoided by sophisticated devices.

Mr. Justice Harlan, dissenting, would have affirmed the dismissal of the Government's complaint by the trial court.

On remand, the District Court's conclusion that there was no reasonable probability that either Pennsalt or Olin Mathieson would have independently entered the market was affirmed by an equally divided court. United States v. Penn-Olin Chemical Co., 246 F.Supp. 917 (D.Del.1965), aff'd per curiam, 389 U.S. 308, 88 S.Ct. 502, 19 L.Ed.2d 545 (1967).[28]

The facts in this case simply do not permit the affirmative applications of the *El Paso* and *Penn-Olin* holdings. Here, the Harford County banking market is not dominated by any one or two institutions, except by Equitable in connection with so-called big-city or non-county bank type of services. In this case, neither party to the proposed merger has sought to take a customer from the other by lowering prices or otherwise, and indeed, there is no substantial active or direct present competition between them (Stipulation A). Further, neither party to this merger threatens to dominate any market. Obviously, First of Harford poses no threat to First of Maryland in areas in which the latter operates, since First of Harford has no local offices in those areas, is largely "loaned up," offers a county line rather than a city line of banking services, and is so much smaller than First of Maryland. And First of Maryland has no local offices in Harford County, certainly cannot be expected to enter for the sole purpose of competing in the Harford County market for deposits, county-line services, and local-type loans, and is not likely, in any event, substantially to affect the market for county-type business when it enters Harford County and provides a full line of commercial banking services.

Plaintiff also contends that First of Maryland by its present position on the edge of the market is a restraining influence on the market and that its abandonment of that position poses both an immediate and a future threat of substantial anticompetitive effect on the Harford County banking structure (Tr. 161). But that market is today governed by competition for deposits and by the deficit lending position of all of the banks except Equitable and Union. First of Maryland's position "in the wings" of Harford County does not appear to restrain or compel any action by any bank now doing business in Harford County with regard to any service it now offers, except for those services being currently rendered solely by Equitable. The existence "in the wings" of the big five Baltimore City and other Maryland banks is important in connection with restraints upon Equitable's potential exercise of its present monopolistic opportunities with regard to those services. But any restraint of that type which is now being exercised by First of Maryland upon Equitable, as well as any possible restraining influence which First of Maryland presently has upon any of the banks (other than First of Harford) operating in Harford County, will be immeasurably increased when the actor moves to center-stage and in fact enters into competition with Equitable and all other banks now operating banking offices in Harford County [29] (Tr. 834).

---

**28.** Because the District Court reached that conclusion, it did not answer the question of whether, if Penn-Olin had not been formed and either Olin Mathieson or Pennsalt had entered the market, the other, as a reasonably probable entrant,

"would have maintained such continued interest in the * * * market as to constitute it a significant potential competitor" (246 F.Supp. 919).

**29.** The Regional Administrator for National Banks, an officer in the agency

And since the current restraining influence of First of Maryland upon First of Harford would seem minimal at most, the loss of that influence cannot be said substantially to lessen competition on a present or potential basis.

In Federal Trade Commission v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), Procter & Gamble acquired the assets of Clorox, which dominated the national household liquid bleach market with almost 49% of national sales. At the time of the merger, Clorox's market share was increasing year by year and its nearest competitor accounted for only slightly more than 15% of national sales. Thus, two companies held about 65%, and together with four others, about 80% of the national market. Mr. Justice Douglas (at 570, 87 S.Ct. 1224) characterized the industry as "highly concentrated," noted that in some regions Clorox's share of the national market was substantially greater than 49%, and commented on the importance of a big advertising budget in marketing a product which is substantially the same no matter who makes it, that Procter held over 54% of the packaged detergent market and together with two other companies, about 80% thereof, and that Procter, before acquiring Clorox, did not produce household liquid bleach. The Court agreed with the Federal Trade Commission that "the substitution of Procter with its huge assets and advertising advantages for the already dominant Clorox would dissuade new entrants and discourage active competition from the firms already in the industry due to fear of retaliation by Procter" and also that Procter was "the most likely prospective entrant" into the market and "absent the merger would have remained on the periphery, restraining Clorox from exercising its market power" (at 575, 87 S.Ct. at 1229). Mr. Justice Douglas wrote (at 578, 87 S.Ct. at 1230) that the acquisition of Clorox by Procter might "substantially reduce the competitive structure of the industry by raising entry barriers and by dissuading the smaller firms from agressively competing." He characterized the industry as "already oligopolistic before the acquisition" (at 578, 87 S.Ct. 1224), and stated that "the existence of Procter at the edge of the industry exerted considerable influence on the market" (at 581, 87 S.Ct. at 1231).

General Foods Corporation v. FTC, 386 F.2d 936 (3d Cir. 1967), involved a Federal Trade Commission order under section 7 of the Clayton Act requiring General Foods, one of the largest producers and distributors of packaged food in the United States, to divest itself of all S.O.S. assets. The Third Circuit affirmed, holding that the Commission was justified in concluding that the acquisition would substantially lessen competition in the steel wool soap pad market. Prior to the acquisition, "the steel wool industry had been an almost perfectly balanced duopoly" (at 938) between S.O.S. with 51% of sales, Brillo with 47.6% and three small companies with the remaining 1.4%. Steel wool soap pads are sold principally by the same grocery and supermarket outlets as are General Foods products. Mass advertising, including national television, is most important in promoting sales of such products. General Foods had one of the nation's largest advertising budgets. After the merger, as S.O.S. was integrated into the General Foods' organization, Brillo moved ahead of S.O.S., but after a short period, S.O.S. went ahead rapidly.

The acquisition in type was a conglomerate merger and a products-exten-

headed by the Comptroller, testified (at Tr. 445–46) that he recommended the merger because of the "substantial demand for loans in the county, and that the merger would bring additional lendable funds to the community, * * * [and] would also bring conveniently to the county an increased loan limit, that is to any one customer; trust services, * * * other banking services which * * * the county residents would benefit from, * * * [provide] an alternative source as opposed to the Equitable Trust Company * * * [and] be procompetitive * * *." See also Tr. 444, 453, 473.

sion merger—the latter because S.O.S.'s products were easily absorbed into General Foods' distribution of its packaged foods. The Third Circuit agreed with the F.T.C. that the merger raised "virtually insurmountable entry barriers which were already high" for new entrants into the market, that the presence of General Foods changed the market structure in a way which could be expected to "depress rather than enhance the competitive vitality of the market" (at 945), and that the merger was likely to "trigger other mergers and give impetus to further concentration" (at 946). The Court noted (at 946) that General Foods "was not a potential competitor lurking on the fringe of the soap pad market and exerting an effect on the actions of the actual competitors" but that product-extension mergers, such as those illustrated by Clorox, are nevertheless proscribed if their likely effect is to reduce potential competition.

In United States v. Wilson Sporting Goods Co., 288 F.Supp. 543 (N.D.Ill.E.D. 1968), Wilson Sporting Goods Company (Wilson), a subsidiary of a "giant conglomerate company" (Ling-Temco-Vought, Inc.) proposed to acquire by a products-extension merger "the leading manufacturer and seller of gymnastic equipment," Nissen Corporation (Nissen). Only four companies making such equipment were able to produce gymnastic products meeting Olympic or college association standards. The Government contended that the merger "would entrench and possibly increase Nissen's already leading market position * * discourag[e] smaller competitors from aggressive competition with Nissen * * * [,] [deter] other companies from entering the market * * *, eliminate Wilson as an important potential entrant into the market through either internal expansion or through merger with a smaller company * *, end its role as a company on the fringe of the market as a restraining influence on prices and profit margins * * *, entrench and increase Wilson's leading role in the sporting goods market and

eliminate the actual and potential competition that an independent or otherwise merged Nissen might have mounted against Wilson" (at 551). The Court characterized the gymnastics equipment industry as "highly concentrated" (at 553) and " 'oligopolistic,' although not nearly as highly 'oligopolistic' as in Clorox" (at 554). In this factual context, the Court observed (at 558):

* * * What is most significant about the Wilson-Nissen merger is the effect it is likely to have on the probable courses of action to be taken by the present gymnastic companies and by the sporting goods firms which are the major likely entrants.

Previously, the other firms in the industry were doing well enough on their own so that they did not want to sell out * * *. Thus, interested large firms * * * had to give serious consideration to entering through internal expansion, a path which would have added additional competitors * * *.

It is not at all unlikely that a Wilson-Nissen merger could engender a series of responsive mergers that would have the effect of eliminating the major potential entrants.

In this case, all of the local Harford County bankers have expressed belief that the conduct of their type of banking will not be threatened by First of Maryland merging with, and taking the place of, First of Harford. They expressed fear only of the opening of additional branch offices with the consequent further division of deposits already in short supply. They expressed no fear that a second bank, offering city-type bank services, would deprive them of the opportunity to continue to hold their county-type business. They apparently believe their own resources are sufficient to enable them to continue to exist as county-type banks—that there is and will be a place for such banks—and that they will themselves prosper and grow if the county is enabled, by the presence of big city banking services, to emerge from its

present capital deficit position and to have available to persons doing business in the county the loanable funds and city-type services not now sufficiently available. Many of them also expressed the view that competition for Equitable in connection with big-city banking services would be healthy for all of them. None of them stated that he expected that this merger would trigger any other merger, though other local banks have discussed merger with Baltimore City banks (Tr. 69, 75, 78, 90–91, 94, 98, 117–18, 286, 342).

In addition, there is no evidence in this case that the merger will create a barrier (as the Government contends (Tr. 887–89)) to entrance of newcomers into the Harford County banking community. If that market is a healthy one for county-type or city-type banks, there is no reason to believe it will not attract newcomers. The entry of National City Bank into Baltimore City and of Chesapeake National Bank into Baltimore County are aptly cited by intervenor's counsel (Tr. 981–82) as instances in which new banks have recently appeared on the scene in areas in which the Baltimore City banks operate.

Nor is there any testimony in the case that First of Harford's potential deposit level can be expected to increase significantly because of the merger, though it is noted that First of Harford's deposits have been increasing in volume and that it is possible that the attraction of First of Maryland's wider line of services and increase in the loan to deposit ratio may more than offset the loss of status as a local bank and cause the rate of increase of deposits to be somewhat augmented (Tr. 157, 269, 697, 802, 887–88).[30] It is anticipated that the merged bank will increase First of Harford's current loan level as well as the loan level which that bank can be expected to attain if it continues to operate in its present status (Tr. 697). The merged bank clearly will not dominate any aspect of Harford County banking except that it will share with Equitable the latter's present sole dominance of a portion of that market. In that way, and because a big city bank will offer many new services and also have considerably more independence from the need for profits in Harford County than does a smaller independent bank such as First of Harford, the merger will of course somewhat change the structure of banking in the county.

The main position which plaintiff seeks to establish is that there is a reasonable probability that First of Maryland will in the foreseeable future enter *de novo* into Harford County if the proposed merger is not permitted. Plaintiff's argument is that the reasonable probability of such potential *de novo* entry requires this Court to hold that this merger will tend substantially to lessen future competition. Plaintiff also contends that there is a reasonable probability that if this merger is proscribed, First of Maryland will merge with a Harford County bank smaller than First of Harford and that such a merger would be less anticompetitive and more procompetitive than this merger.[31] But the

---

30. The loan to deposit ratio of First National Bank of Aberdeen was 65% to 75% (Tr. 48–49) when it merged with Equitable in 1963 (Tr. 40) and had increased to 90% or more by the time of the trial in this case (Tr. 49, 51).

31. Plaintiff does not seem to have urged that First of Harford could have provided a more procompetitive substitute by bolstering its management and departing from its present dependence upon the abilities of one or two men, or by merging with other banks, or by increasing its financial base through sale of its stock, or by expanding into other areas,

all of which alternatives First of Harford considered (Tr. 609–10; Snodgrass Deposition, 47–50). First of Harford's solution of future management problems would have little effect upon its ability to meet the lending requirements of its customers in the context of its "loaned-up position" (Tr. 610) which its principal officers testified is the primary reason why First of Harford suggested this merger (Tr. 383; Snodgrass Deposition, 16). And, in any event, there is no evidence that the merger of First of Harford with any bank capable of supplying city-line services and sufficient

merger of First of Maryland with any other Harford County headquartered bank runs directly into the name problem, a problem which also has relevance in connection with the possibility of First of Maryland's *de novo* entry into Harford County.

First of Maryland, from its inception, did business under the name of First National Bank of Baltimore until it began to establish branches outside of Baltimore City, at which time, i. e., 1962, it changed its name to First National Bank of Maryland (Tr. 350). First of Harford, prior to the early 1960's, operated under the name of First National Bank of Bel Air. It changed its name to First National Bank of Harford County when it opened its first two branch offices in Edgewood and Aberdeen (Snodgrass Deposition, 5–6).[32] The words "First National" also appear in the name of First National Bank and Trust Company, Havre de Grace, which used the appellation of "First National" before First of Bel Air (Tr. 404, 695). The name problem, which is further discussed *infra* in connection with *de novo* entry, provides a significant barrier to merger by First of Maryland with any other Harford County bank.

Plaintiff's argument that First of Maryland should be required to merge with a Harford County bank smaller than First of Harford was not highlighted, at least in terms of trial of the case, by plaintiff's counsel to anything like the degree of its *de novo* entry contention. Nor does the smaller bank merger possibility stand scrutiny in the light of First

of Maryland's need for branches in as many as possible of the Bel Air, Aberdeen, Edgewood, Joppatown and Havre de Grace areas if it is to develop the deposit base necessary to support the provision of city-type services on a county-wide basis. Also, the name problem would prevent First of Maryland from merging with any local Harford County bank other than First of Harford or First National Bank and Trust Company. And merger with the latter would not only fail to satisfy First of Maryland's requirements because it would provide only a small base in Havre de Grace and Churchville, but also because, in terms of the future, it would leave First of Maryland with the name problem barrier if it should try to expand into Bel Air, Aberdeen and Edgewood where First of Harford operates offices.[33]

Putting aside the name problem, the only local bank, other than First of Harford, which provides any kind of an initial platform for rendition of county-wide services is Commercial and Savings Bank. The latter operates in Bel Air and in Edgewood, though its Edgewood locations are outmoded Army installations not suitable, without reconstruction or relocation, for the housing of the kind of banking office First of Maryland requires (Tr. 734–36). Thus, Commercial and Savings Bank would be a poor substitute for First of Harford. And also, in terms of size of bank, an examination of the deposit and loan figures of First of Harford and Commercial and Savings Bank reveals that only within the last decade has the former pulled ahead of

loanable funds would, in the foreseeable future, have any different effect on competition in the county than will the present merger. Thus, this is not a case, as Mr. Justice White suggested might be the case in *Nashville*, in which the smaller party to the merger can solve its own problems in a more procompetitive way. In the context of *Nashville*, it is to be noted that First of Harford is not a "failing bank" or a financially unsound institution (*see Nashville, supra* 390 U.S. at 189–190, 88 S.Ct. 882) ; rather, it has been and is a profitable bank (Tr. 482).

32. The merger of First of Harford with any of the larger Maryland banks other than First of Maryland would mean the loss of its long-used, identifying designation as "First National."

33. First of Maryland has not in fact discussed the acquisition of or merger with any bank in Harford County other than First of Harford (Tr. 739). This subjective evidence supports the objective facts available in this case.

the latter (Plaintiff's Exhibit 100).[34] The differences in their recent performances are, in this Court's judgment, due to present management and approach.

Finally, to say that First of Maryland can merge with the number two local bank in Harford County but not with the number one local bank is to draw lines and to create shades of distinction which cannot be justified in as elusive and delicate a process as is posed by the scanning of the Harford County banking horizon[35] in search of objective clues for the foreseeable future.

All of the parties agree that there is no substantial present competition between First of Maryland and First of Harford. First of Maryland, of course, has some customers who live or do business in Harford County but First of Maryland is not currently offering them services at any Harford County location and its business dealings with Harford County based customers are presently lacking in substantial effect upon the Harford County market.

There is little or no disagreement that First of Maryland and all or most of the other "big five" Baltimore City banks, along with perhaps certain other banks now operating in Maryland, are potential entrants into Harford County (Tr. 155–56, 231). The question remains as to whether First of Maryland is a reasonably probable potential *de novo* entrant. The facts of this case reveal not only the current and reasonably foreseeable banking situation in Harford County (which has been discussed *supra*) but also the present and reasonably predictable organizational structure of First of Maryland. That bank has established a regional banking pattern as it has expanded since 1962. It has regional headquarters in Salisbury, Hagerstown, Rockville and Towson (Tr. 676–77, 740). It seeks to establish regional offices in key towns. It has smaller branch offices

elsewhere in each region. It tries to staff its home Baltimore City office, its regional headquarters and its branch offices in such a way that when a customer comes into any First of Maryland banking office, either someone there can supply the required service or advice, or someone who is so qualified can come to that office on a time schedule satisfactory to the customer (Tr. 353, 364). The goal is to permit the customer to do business in the local office he wants to deal in, where he knows the local personnel, the latter know him and both feel at home (Tr. 681–82)—to engage in what is called "face to face" banking (Tr. 680, 817–18, 832–33). To do this requires expensive staffing. To justify such services, there must be a sufficiently large deposit base. And to acquire that base in Harford County on a county-wide basis requires separate regional operations in Harford County with offices in as many as possible of Bel Air, Aberdeen, Edgewood, Joppatown and Havre de Grace (Tr. 675–76, 680, 694). And that means more expense than there would be if one key town existed in that county.

National banks must apply for permission to open branches on a one-by-one basis. No commitments are given by the Comptroller in advance (Tr. 456). Further, opening branches costs money. Branches usually take years to become profitable. The experience of First of Maryland in other counties, and of Equitable and of First of Harford in Harford County, demonstrates this hard fact of life. First of Maryland, whether or not its own subjective disclaimers of lack of intention to enter Harford County *de novo* are accepted (Tr. 325ff., 685ff.), cannot objectively be considered a candidate for starting from scratch in that county with no deposit base and for incurring the losses which would almost inevitably have to be swallowed for years to come.

---

34. In 1960, the total deposits of the two banks were almost even, with Commercial and Savings a shade ahead. In 1961, First of Harford moved a bit in front and by 1968 had better than a three to two lead.

35. Judge Clary's metaphor in *Provident* on remand, *supra* 280 F.Supp. at 19.

Why should First of Maryland put itself in such a position? True, it does today possess excess lendable funds of "many millions of dollars" (Tr. 311). It would like to put them to work in expanding areas. Harford County is growing. Its percentage population increase by 1980 and by 1985 is forecast to be great. But its absolute rate of expansion in the foreseeable future is expected to be much less than that which is anticipated in Baltimore City and in a number of Maryland counties including Baltimore, Montgomery, Prince George's, Anne Arundel and Howard. An analysis of the projections to 1985 indicates that not only in terms of persons per banking office but also in terms of deposits and accounts per banking office, each of those other counties offers First of Maryland more attractive territory than does Harford County (Tr. 674, 709, 713, 717, 721, 724–26, 728–31, 808 ff.). Professor Williams' metaphor (Tr. 859) that "50 per cent of a grape ain't the same as 5 per cent of a watermelon" hits the mark with force. A share of the existing watermelons which are expected to continue to grow in a number of the other areas of the State is clearly more attractive than the share in the smaller piece of fruit which is Harford County, even though the latter is fast growing, healthy and most attractive. In the next fifteen years, such other areas, together with First of Maryland's projected nine or ten new locations in Baltimore City, Baltimore County, Montgomery County, Prince George's County and Howard County (Tr. 709), would appear to provide ample ploughable ground in which First of Maryland can plant the seeds of its excess loanable funds (Tr. 731–32). First of Maryland's growth requirements can also be implemented by placing additional emphasis upon securing more business in areas in which the bank is already operating and by offering new and additional bank services and functions in existing bank offices as well as through geographical expansion (Tr. 811).

It would appear that First of Maryland is justified in its belief that it cannot, unless it abandons its regional approach, operate branches in Harford County as part of its Baltimore City or Baltimore County regions. Harford County is a market separate from Baltimore County and from the Baltimore City metropolitan complex (Tr. 745–46, 782), even though, some day, as the urban areas from New York to Washington, or even from Boston to Richmond, become entwined, Harford County can be expected to become more and more part of the Baltimore area (Tr. 802). But in this case, the parties agree that the "section of the country" is Harford County. Nevertheless, the plaintiff raises the question of whether First of Maryland could not open *de novo* branches in Harford County by attaching those branches to its Baltimore County or, perhaps, to its Baltimore City, region.

It is true that First of Maryland expects to open a branch in the new city of Columbia, with a present population of less than 10,000 persons and a planned and quite predictable population of 100,000 by 1980, and to operate that branch, at least at the start, as part of its Baltimore County region. Columbia is about as distant in terms of miles and time of travel from First of Maryland's offices in Towson or Catonsville (both in Baltimore County) as Bel Air and other points in Harford County are from Baltimore City or from the Baltimore County seat at Towson. Yet Columbia is an atypical situation. Nowhere in Harford County or elsewhere in Maryland is there a community in which an important customer of First of Maryland, namely, General Electric Co., will be one of the principal employers in a new, soundly-financed community which gives every indication that it will become a thriving community of 100,000 persons by 1980 (Tr. 726–27, 741, 782, 784, 786, 791).

First of Maryland's subjective position that its *de novo* entry into Harford County is not reasonably probable (Tr.

323–24) is amply supported by objective criteria. In *Penn-Olin* (*supra* 378 U.S. at 174, 84 S.Ct. 1710), the Supreme Court referred to certain indicia of such criteria, including growth prospects of the market, resources and know-how of the potential entrant vis-a-vis those of other potential entrants, identification with the industry in other areas, interest shown by the potential entrant in the market, reputation and business connections with customers in the market and ability to enter at a reasonable profit. First of Maryland fits snugly into many of those indicia. Harford County is a growth area with prospects for continuing growth. First of Maryland has the resources, know-how, identification, reputation and customer business connections. But this Court believes that neither First of Maryland's actions or statements nor the objective facts support the conclusion that it has any interest in entering the county *de novo* or can reasonably be expected to do so in the foreseeable future, or, if it did enter *de novo*, could thereafter operate in the foreseeable future with a full line of commercial bank services, at a reasonable profit.

The name problem simply adds negative icing to the Government's contention that First of Maryland is a reasonably probable *de novo* entrant (Tr. 325, 334–35, 336, 350). First of Maryland would be buying name litigation from First of Harford if it entered into the latter's territory without changing its name (Tr. 402–04, 423). Under applicable federal and state statutes,[36] the Comptroller, whose advance permission is needed before a national bank can enter a new area, could refuse to grant that permission on the ground that such entry would be harmful because of the similarity in name of the entering bank with a bank already—and in this case—long on the scene (Tr. 473). And case law shows that a bank, like any other type of corporation, is entitled to enjoin the use by a newcomer of a name confusingly similar to its own.[37] While changes in the use of and emphasis placed upon words in a name can often alleviate confusion, it is hard to believe that any such changes could remove the cloud of name usage litigation if First of Maryland were to move into the area of First of Harford under a name which includes "First National." And any significant change of name, or lack of use of the designation, "First National," by either is certainly not foreseeable. Of course, regardless of whether the First of Maryland—First of Harford merger takes place, possible name problems will continue to exist in connection with the expansion within the county of either First of Harford or of the Havre de Grace bank.[38] First of Maryland accepts that problem in connection with any new offices it may desire to establish,

---

36. 12 U.S.C. § 36 provides that a national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches "at any point within the State in which said association is situated, * * * subject to the restrictions as to location imposed by the law of the State on the State banks." 1 Md.Ann.Code art. 11, § 29 provides, in part: "The name of such bank. This name shall be in no material respect similar to the name of any other bank in the same county or city."

37. *See* First National and Trust Company of Kalamazoo v. First National Credit Bureau, 364 Mich. 521, 111 N.W.2d 880 (1961); Middleton Trust Co. v. Middleton National Bank, 110 Conn. 13, 147 A. 22 (1929); Philadelphia Trust, Safe Deposit and Insurance Company v. Philadelphia Trust Co., 123 F. 534 (D.Del. 1903). *See also* Chayt v. Darling Retail Shops Corporation, 175 F.Supp. 462 (D. Md.1959); National Shoe Stores Co. v. National Shoe Stores of New York, Inc., 213 Md. 328, 131 A.2d 909 (1957); Edmondson Village Theatre v. Einbinder, 208 Md. 38, 116 A.2d 377 (1954); Afro-American Order of Owls, etc. v. Talbot, 123 Md. 465, 91 A. 570 (1914).

38. *See* Food Center, Inc. v. Food Fair Stores, Inc., 356 F.2d 775 (1st Cir. 1966); Food Fair Stores, Inc. v. Lakeland Grocery Corp., 301 F.2d 156 (4th Cir.), *cert. denied*, 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962); Chayt v. Darling Retail Shops Corporation, *supra*.

after its merger with First of Harford, in the limited areas in which First National Bank and Trust Company, Havre de Grace, presently has offices. But First of Maryland will seemingly not have that name problem in Bel Air, Aberdeen and Edgewood, three spots at which First of Harford has established offices and which First of Maryland considers "musts."

■ In opening argument, counsel for plaintiff stated (Tr. 16–17):

\* \* \* We have no objection to defendants going into this county. We encourage the defendants to go into this county. We encourage any of the banks to go into this county and supply funds for this county. We think that proves this is a growing market \* \* \*.

We welcome them in there; where we differ with them, we don't want them going in and buying the biggest bank, because we think the law says they cannot do that.

Yet, plaintiff has not contended that the substitution of First of Maryland (with First of Harford merged into it) for First of Harford—i. e., the big city bank taking over a healthy county bank —in and of itself is proscribed. Nor would that position, if taken, be sound. But, unless that flat legal proposition is tenable, plaintiff's challenge herein must fail. The effect of the First of Maryland—First of Harford merger will not, in the words of section 7 of the Clayton Act, "substantially \* \* \* lessen competition, or tend to create a monopoly" in the commercial banking market in Harford County. Instead, this merger will be, in terms of the Bank Merger Act of 1966, and the Supreme Court's opinion in *Nashville, supra,* a significant move in the direction of satisfying the "convenience and needs" of that county. Defendants have borne their burden of proof in that latter regard, by a wide margin. And by an even wider margin plaintiff has failed to shoulder its Clayton Act burden.

For the reasons stated, plaintiff is not entitled to prevail herein. Counsel will prepare an appropriate order pursuant to which judgment will be entered in favor of the defendants and the intervenor.