UNITED STATES of America, Plaintiff,

v.

FIRST NATIONAL BANCORPORATION, INC., and the First National Bank of Greeley, Defendants.

Civ. A. No. C–2413.

United States District Court, D. Colorado.

July 12, 1971.

Herbert G. Schoepke, Kevin D. Brenan, Alan R. Malasky, Eugene V. Lipkowitz, Attys., Dept. of Justice, Antitrust Div., Washington, D. C., James L. Treece, U. S. Atty. by Carolyn J. McNeill, Asst. U. S. Atty., Denver, Colo., for plaintiff.

Metzger, Schwarz, McKenna & Kempler by Eugene J. Metzger, Carl J. Schwarz, Donald Williamson, Washington, D. C., of counsel, Hughes & Dor-

sey by Edward B. Close, Jr., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

### I. PRELIMINARY STATEMENT

Involved in this action is the attempted acquisition of The First National Bank of Greeley by the First National Bancorporation, Inc. The United States has instituted this suit under Section 15 of the Clayton Act, 15 U.S.C. § 25, seeking an injunction preventing the alleged violation of Section 7 of the Clayton Act. The cause was tried to the Court, and following the filing of post-trial briefs, together with proposed findings, has been submitted.

### A. BACKGROUND OF THIS LITIGATION

On June 9, 1970, the Board of Governors of the Federal Reserve Board approved in a four-to-three decision the application of First National Bancorporation, Inc. for the acquisition of 80 percent or more of the voting shares of The First National Bank of Greeley. The opinion of the Board recites that the comptroller had been duly notified and had approved the application. The majority opinion considered all of the evidence and concluded that the proposed acquisition would not have the effect of substantially lessening competition or would not tend to create a monopoly. It was pointed out that this was the first expansion by First National Bancorporation, Inc., outside the Denver area, and that while other applications about which the Board had knowledge might change the banking structure in the state, that this one would not have such an effect. It was noted that one of the competitors in Greeley was also a leading competitor of First of Denver in Denver (United Bank); that there existed, however, no likelihood that a structure in Greeley would result in mirroring the situation in Denver. In a concurring opinion one of the Governors pointed out that Weld County (where Greeley is located) is not underbanked;

that, rather, there are more banking institutions per population than in the adjoining counties of Larimer and Boulder.

The main thrust of the minority opinion was that the proposed acquisition was one step in a trend toward concentration not only in the Greeley area but in the state as a whole, and that the Board should not approve an acquisition in furtherance of this trend. The minority finally said:

> In our view, the effect of consummation of the applicant's proposal would be to substantially lessen *future* competition in Greeley, in Weld County, and perhaps in other Colorado areas which might otherwise have been served by a new organization which bank could have significantly participated.

The minority also considered that one result of the acquisition would be to close a mortgage loan production office maintained by The First National Bank of Denver, the lead bank of Bancorporation, and would thus remove this institution as a competitor, and would also lessen potential competition resulting from The First National Bank of Denver being on the threshold of the market.

### B. THE BANKING INSTITUTIONS INVOLVED

As noted above, Bancorporation is a registered bank holding company organized under the laws of Colorado and maintains its principal place of business in Denver. On the other hand, The First National Bank of Greeley is a national banking association organized under the laws of the United States which operates in Greeley, Weld County, Colorado, which is roughly 50 miles north of Denver. Both Bancorporation and The First National Bank of Greeley are engaged in interstate commerce. Moreover, the Court has jurisdiction of the action.

The main nucleus of Bancorporation is The First National Bank of Denver. However, there are three other subsidiaries—commercial banks—all of which are located in the metropolitan area sur-

rounding Denver, Colorado. The First National Bank of Denver is the largest commercial bank in Colorado. Its total deposits as of June 1970 amounted to $468.0 million, 12.3% of the total commercial bank deposits within Colorado. Its assets total $586.5 million, and its loans and discounts total $340.8 million.

The other three commercial banks, subsidiaries of Bancorporation, are The First National Bank of Northglenn, The First National Bank of Bear Valley and The First National Bank of Southglenn. Each of these banks was organized *de novo* by officers and directors of The First National Bank of Denver.

The Northglenn bank was established on November 14, 1963. It is located in the suburban community of Northglenn in Adams County, which adjoins Denver County. It has been, from the date of its opening to the date of its acquisition by Bancorporation, an affiliate of First National Bank of Denver. Its total assets as of June 1970 amounted to $9.5 million. It had total deposits of $8.5 million and total loans and discounts of $6.1 million. Its income in 1969 amounted to $780,058, an increase over prior years.

The First National Bank of Bear Valley was also organized by officers and directors of The First National Bank of Denver, having been established on June 15, 1964. This institution is located within the City and County of Denver and has been, from the date of its opening to the date of its acquisition by Bancorporation, an affiliate of The First National Bank of Denver. The total assets of the Bear Valley bank are $11.4 million. Its total deposits are $10.1 million, and its loans and discounts total $6.9 million. Its income as of 1969 had substantially increased over the prior years.

Similarly, The First National Bank of Southglenn was organized *de novo* by officers of The First National Bank of Denver, having been established on November 30, 1964, in Littleton, Arapahoe County, Colorado. It was an affiliate of

The First National Bank of Denver from the date of its opening until its acquisition. As of June 1970, it had total assets of $6.4 million, total deposits of $5.8 million and total loans and discounts of $3.2 million. Its total income in 1969 was substantially higher than in prior years.

As noted above, the present acquisition represents the first attempt by Bancorporation to acquire a banking institution outside of Denver. This application was approved, as also noted, by the Board of Governors on June 9, 1970. On July 8, 1970, the Antitrust Division of the Department of Justice brought the present suit.

The First National of Greeley was established in 1884. Its only office is in the City of Greeley, County of Weld. As of June 1970, its deposits totaled $39.2 million, and its total loans and discounts amounted to $28.9 million. It is the fifteenth largest bank in Colorado from the standpoint of total deposits, and the twelfth largest in terms of total loans and discounts.

The evidence does not disclose that there is competition at the present time between The First National Bank of Denver and The First National Bank of Greeley. To be sure, The First National Bank of Denver maintains a mortgage loan production office in the City of Greeley. This institution does not perform banking functions, but rather sells and services real estate loans to long-term investors such as savings and loan institutions, mutual savings banks and insurance companies. This service is performed for a fee and the most that can be said as to its contribution to the objectives of Bancorporation and First National Bank of Denver is that it undoubtedly serves to furnish information as to the market conditions to the First National, although there is no evidence in the record which establishes this fact. In other respects the First National Bank cooperates with The First National Bank of Greeley in connection with over-

line loans either itself or through its correspondent banks in other sections of the country. The First National Trust Department administers a small number of trusts for individuals who live in Weld County, but it does not solicit this kind of business there. Accordingly, it cannot be said that the proposed merger or acquisition qualifies as a horizontal one.

## C. COMMERCIAL BANKING INSTITUTIONS IN GREELEY

There are six commercial banks in the City of Greeley and two other banks in what is referred to as the Greeley Area —which includes communities adjacent to the City of Greeley.[1] The following Table sets forth the relative percentages of total deposits held by each of these eight banks as of June 1970:

TOTAL DEPOSITS–COMMERCIAL BANKS IN THE CITY OF GREELEY AND THE GREELEY AREA *

| (Dollar amounts in thousands) June 1970 | | | | (Dollar amounts in thousands) June 1970 | | |
|---|---|---|---|---|---|---|
| | Amount | % of City | % of Area | | Amount | % of City | % of Area |
| FIRST NATIONAL BANK OF GREELEY | $ 39,237 | 33.9% | 31.8% | UNITED BANKS OF COLORADO, INC. | | | |
| AFFILIATED BANKSHARES OF COLORADO, INC. | | | | United Bank of Greeley | $ 24,743 | 21.4 | 20.0 |
| Greeley National Bank | 39,279 | 34.0 | 31.8 | State Bank of Greeley | 2,070 | 1.8 | 1.7 |
| Cache National Bank | 7,080 | 6.1 | 5.7 | TOTAL: CITY OF GREELEY | $115,682 | 100.0% | 93.7% |
| West Greeley National Bank | 3,273 | 2.8 | 2.7 | South Platte National Bank, LaSalle | 2,773 | | 2.2 |
| | | | | Eaton Bank | 4,983 | | 4.0 |
| | | | | TOTAL: GREELEY AREA * | $123,438 | | 100.0% |

Note: Detail may not always add to total due to rounding.
* Includes City of Greeley, and adjacent towns of Evans, LaSalle, Peckham, Kersey, Gill, Eaton, Lucerne, Farmers and Bracewell.
Source: Reports of Condition of individual banks, June issues, 1969 and 1970.

---

While there is some evidence that FNB Greeley and other Greeley Area banks effectively compete in the rest of Weld County,[2] Bancorporation's Application to the Board of Governors of the Federal Reserve System to acquire FNB Greeley characterizes an area similar to the Greeley Area as FNB Greeley's "Primary Service Area" and characterizes an area extending easterly and northeasterly from Greeley (comprising somewhat less than half of Weld County) as FNB Greeley's "sphere of influence."

The City of Greeley, the Greeley Area and Weld County have all experienced a moderate amount of economic and population growth over the last decade,[3] although the area certainly cannot be characterized as a "boom" area such as Boulder or Colorado Springs. Some industry

1. The seven banks other than FNB Greeley were listed in Bancorporation's application to the Board of Governors of the Federal Reserve System as "all other banks that Applicant believes to be competing with" FNB Greeley.

2. FNB Greeley has $3,130,000 of its $28,897,000 in loans in the rest of Weld County (outside the Greeley Area).

3. The 1970 population of the Greeley Area was 58,500, a 29.3% increase over its 1960 population of 45,228. Most of the population growth in the Greeley Area is attributable to the City of Greeley. Economic statistics presented by plaintiff indicate that from 1960 to 1970 the number of main telephones in the Greeley Area increased 48.2% and electric power consumption increased 115.8%. Gas customers increased 45.3%, while total gas volume consumed increased 127.3%. In addition, the rural families served by the Greeley Post Office have increased 43.3% since 1960, while the number of individual customers served has increased 27.8%. The growth of the City of Greeley and the Greeley Area has also been reflected throughout Weld County as a whole. Finally, the population of the City of Greeley is roughly 38,000, of which 10,000 consist of students attending the college located there.

has moved into the area during recent years, but Weld County continues to be primarily a farming area and agricultural loans continue to constitute a substantial part of the bank's business.[4] There is also evidence concerning odors from the packing plants and feedlots which suggests that Greeley is not likely to become a great population center in the near future. Despite this growth, there is some evidence to the effect that the Greeley Area is presently quite adequately served by its existing banking institutions.

## D. STATEWIDE HOLDING COMPANIES

One other aspect which should be mentioned in connection with the background of this case is that the last decade has seen a trend of holding company formations and bank acquisitions in Colorado. As of December 31, 1960, Western Bancorporation of Los Angeles was the only bank holding company operating in Colorado. It had three bank subsidiaries which held 4.4% of the total commercial bank deposits in the state ($87.5 million). As of December 31, 1970, there were seven bank holding companies in Colorado with 41 commercial bank subsidiaries. These holding company banks, as of June 1970, held 51.1% of total Colorado deposits.[5]

In addition, Bancorporation has received Federal Reserve Board approval for the acquisition of FNB Greeley and the Security State Bank of Sterling (these are in litigation), and it has an application pending for approval of the acquisition of the National State Bank of Boulder. Bancorporation's applications to acquire banks in Montbello and Pueblo have been denied, and the agreement to acquire the Exchange National Bank of Colorado Springs, for

---

4. Whereas farm earnings accounted for 49.2% of total earnings in Weld County in 1950, by 1968 they had decreased to 28.3% of total earnings. In the same period, earnings from manufacturing increased from 4.1% to 11.1%. The industrial usage of gas increased from 15.2% of the gas consumed in 1960 to 35.9% of the gas consumed in Weld County in 1970. This diversification took place during a time in which Weld County remained one of the top ten agricultural counties in the United States.

---

5. The following table summarizes the percentages of Colorado deposits held by each of the bank holding companies and the areas in which their subsidiaries operate. The holding companies are listed in order of their formation.

### TOTAL DEPOSITS HELD BY BANK HOLDING COMPANIES IN COLORADO AS OF JUNE 1970

| BANK GROUP (Dollar amounts in thousands) | Amount | % of Colorado |
|---|---|---|
| WESTERN BANCORPORATION (operating three banks in Denver, Englewood and Fort Collins) | $ 197,858 | 5.2 |
| FIRST COLORADO BANKSHARES (formation approved, 11/16/61) (operating four banks in Denver, Englewood and Wheat Ridge) | 120,378 | 3.1 |
| UNITED BANKS OF COLORADO, INC. (formation approved, 11/7/63) (operating nine banks in Denver, Aurora, Boulder, Greeley, Littleton, Fort Collins, Lakewood, Pueblo and Grand Junction) | 565,486 | 14.8 |
| COLORADO CNB BANKSHARES (formation approved, 11/29/67) (operating five banks in Denver, Lakewood and Glenwood Springs) | 281,327 | 7.3 |
| FIRST NATIONAL BANCORPORATION, INC. (formation approved, 5/27/68) (operating four banks in Denver, Southglenn, Bear Valley and Northglenn) | 495,675 | 12.9 |
| AFFILIATED BANKSHARES, INC. (formation approved, 12/31/69) (operating 13 banks in Colorado Springs, Fort Carson, Manitou Springs, Loveland, Greeley, Ault, Boulder, Lafayette and Louisville) | 260,176 | 6.8 |
| CENTRAL COLORADO BANCORPORATION (formation approved, 3/31/70) (operating three banks in Colorado Springs and Rocky Ford) | 36,012 | 0.9 |
| | $1,956,912 | 51.1 |

Compiled from plaintiff's Exhibits 113 and 115.

which approval had been granted, has been mutually rescinded by the parties. Also, United Banks of Colorado, Inc. has received approval to acquire the Colorado Springs National Bank (this is also in litigation). Bancorporation's attempt to acquire FNB Greeley is its first attempt to acquire a bank outside the Denver metropolitan area. Also, this is the first effort on the part of the Government to halt the trend of acquisitions. It did not choose to intervene until after the United Banks of Colorado and Affiliated Bankshares had both entered the Greeley Area. Affiliated Bankshares has acquired Greeley's largest and most vigorous bank, Greeley National Bank, plus two additional smaller banks in the area.

## II. THE ISSUES

It is not contended by the government that there exists at the present time any substantial competition between First of Denver and First of Greeley which could be affected by the present acquisition. It is maintained, rather, that *potential* competition would be affected. The government's argument is that if the Bancorporation is to enter the Greeley or the Weld County market, it should do so *de novo* or via the acquisition of the Greeley State Bank, a very small institution, whereby the assets and economic power of First could be utilized in enhancing the competitive atmosphere within the Greeley market. It is also maintained that the presence of two other bank holding companies within the City of Greeley results in the market being presently a concentrated one which is likely to result in further concentration with the present acquisition and, finally, entrenchment is likely to result, whereby a substantial threat to competition in the future exists.

A second line of attack which was devised by the government just prior to trial is to the effect that correspondent banking is a distinct line of commerce

apart from commercial banking and that there are a limited number of banking institutions in Denver with capacity to offer a full range of correspondent banking services, one of these being The First National Bank of Denver. It is said that presently there is competition among about six banks in Denver for the offering of this character of service and that the present acquisition will remove a customer and, thus, to that degree will tend substantially to lessen competition in the offering of correspondent banking services to country banks in Colorado.

## III POTENTIAL COMPETITION

In a case alleging violation of Section 7 of the Clayton Act, the government has the burden of proving the "reasonable probability" of a substantial lessening of competition. United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), As the Supreme Court has noted,

[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition "within the area of effective competition." Substantiality can be determined only in terms of the market affected.[6]

The "area of effective competition" must be determined by reference to a product market (the "line of commerce") and a geographic market (the "section of the country").[7]

The government charges that if consummated the effect of the proposed merger may be to substantially lessen competition, in violation of Section 7 of the Clayton Act, through the elimination of *potential* competition. When such a violation is found, the Bank Merger Act of 1966 requires the District Court to decide whether "the anticompetitive effects of the proposed transaction are

---

6. Brown Shoe Co. v. United States, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), *quoting from* United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

7. Brown Shoe Co. v. United States, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed. 2d 510 (1962).

clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." 12 U.S.C. § 1828(c) (5) (B).

■■ The government has the burden of proving the "reasonable probability" of a substantial lessening of competition. United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). The burden of proving that the exception set forth in 12 U.S.C. § 1828(c) (5) (B) is satisfied rests with the defendant banks. United States v. First City National Bank of Houston, 386 U.S. 361, 366, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967). This Court is required to review *de novo* the issues presented, using the identical standards applied by the regulatory agencies. 12 U.S.C. § 1828.

## A. ECONOMIC EFFECTS

■ There being no direct competition here, the proposed merger between the banks at bar is what is described as a "geographic market extension" merger. As such, the concentration in the relevant market remains the same after the merger. It limits us to an evaluation of whether it has the effect of removing a *potential market entrant* and to a consideration whether Bancorporation, which is not yet in the market, may still be a present competitive force, the presence of which deters oligopolistic practices, whereby its merger with a member of that market may eliminate competition in much the same way that a simple horizontal merger can. However:

> The sight of a particular firm "waiting at the market's edge" may emphasize the entry threat, but it is *ease of entry*, not necessarily an identifiable potential entrant, that limits present market power by reminding existing firms that high profits will attract outsiders. The competitive situation will not be affected by a merger with a particular potential competitor unless the merger alters entry conditions or is thought to alter them. Existing firms would have no reason to change

their behavior unless they supposed that the merger eliminated the one firm uniquely capable of entering or substantially reduced the probability of new competition by eliminating one from a small universe of potential entrants. Areeda, Antitrust Analysis at 517 (1967) (emphasis added).

Thus, the issue is a narrow one requiring the weighing and evaluation of future projections—a most difficult process having few tangible standards.

■ A "geographic market extension" merger can, of course, have the *future* effect of eliminating one who would have entered the market independently but for the merger, thereby adding to the number of competitors in the future, but there must be at least some evidence to support a prophecy that such an entrance will occur.

■ How important the elimination of a potential entrant is will depend in part on how *concentrated* the market is, concentration being one indication of a firm's market power. Where concentration is quite low, the merger will have few adverse effects because the market will remain unconcentrated after the merger. Where the concentration is high, the merger removes the potential competitor as a restraining influence and the anticompetitive effects can be significant.

## B. THE PRODUCT MARKET

■ In United States v. Philadelphia National Bank, 374 U.S. 321, 356, 83 S. Ct. 1715, 1737, 10 L.Ed.2d 915 (1963), the Supreme Court held that *commercial banking* was the relevant product market within which to measure the effects of the proposed horizontal bank merger:

> [T]he cluster of products (various kinds of credit) and services (such as checking accounts and trust administration) denoted by the term "commercial banking" * * * composes a distinct line of commerce. *Id.*

Several district court cases involving bank mergers have criticized this definition of a "line of commerce" on the basis that it does not take into account the

cross-elasticity resulting from competition between banks and other institutions providing many of the same products and services included within the definition of "commercial banking." [8] We fail, however, to see any room for such criticism either on the merits of the question or on the basis of positive law. Since *Philadelphia National Bank* the Supreme Court has again stated in no uncertain terms that commercial banking is the relevant line of commerce. In United States v. Phillipsburg National Bank and Trust Company, 399 U.S. 350, 360–361, 90 S.Ct. 2035, 2042, 26 L.Ed. 2d 658 (1970), the Supreme Court said:

> Commercial banks are the only financial institutions in which a wide variety of financial products and services —some unique to commercial banking and others not—are gathered together in one place. The clustering of financial products and services in banks facilitates convenient access to them for all banking customers. For some customers, full-service banking makes possible access to certain products or services that would otherwise be unavailable to them; the customer without significant collateral, for example, who has patronized a particular bank for a variety of financial products and services is more likely to be able to obtain a loan from that bank than from a specialty financial institution to which he turns simply to borrow money. In short, the cluster of products and services termed commercial banking has economic significance well beyond the various products and services involved.

In addition, "commercial banking" is even more relevant as a line of commerce where, as here, a small country bank is being acquired. *Id.* at 361–362, 90 S.Ct. 2035. Moreover, the record here does not disclose what other institutions, if any, compete with Greeley banks for the

products and services which they offer. Hence, there could be no justification for a contrary holding. Therefore, we conclude that the relevant line of commerce is commercial banking.

## C. RELEVANT GEOGRAPHIC MARKET FOR MEASURING THE EFFECTS OF AN ALLEGED ELIMINATION OF POTENTIAL COMPETITION

The test for determining the relevant geographic market is set forth in United States v. Philadephia National Bank, *supra*, wherein the Supreme Court said:

> The proper question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate. * * * [A]s we recently said in a related context, the "area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, *and to which the purchaser can practicably turn for supplies*." *Id.* 374 U.S. at 357–359, 83 S.Ct. at 1738 (emphasis original).

In the case at bar we determine that the "Greeley Area" rather than Weld County (as argued by Bancorporation) is the relevant geographic market within which to measure the effects of the proposed merger upon *potential* competition. This area provides FNB Greeley with a substantial amount of its loans and deposits: 81.9% of its demand deposits, 77.7% of its savings deposits, 76% of its time deposits, 80.6% of its commercial and industrial loans, 71.9% of its personal installment loans, 74.3% of its single payment loans, 75.6% of its real estate loans and 64.5% of its loans to farmers. Although comparisons in

---

8. United States v. Idaho First National Bank, 315 F.Supp. 261, 267–268 (D. Idaho 1970); United States v. First National Bank of Maryland, 310 F.Supp. 157, 168 (D.Md.1970); United States v. First National Bank of Jackson, 301 F. Supp. 1161, 1181 (S.D.Miss.1969); United States v. Crocker-Anglo National Bank, 277 F.Supp. 133, 151–153 (N.D. Cal.1967).

the present context are not too persuasive, we note that compared to the four-county area determined to be the relevant geographic market in the *Philadelphia National Bank* case, 81.9% of FNB Greeley's demand deposits came from the Greeley area (versus figures of 56% and 77% in *Philadelphia National Bank*), 80.6% of its commercial and industrial loans (versus 54% and 63%), and 75.6% of its real estate loans (versus 74% and 84%). The rest of Weld County supplied respective amounts of 6.6%, 1.8% and 9.9%.

Because individuals and corporations generally prefer to do their banking in their local communities, banks normally have a very localized business:

> [C]onvenience of location is essential to effective competition. Individuals and corporations typically confer the bulk of their patronage on banks in their local community; they find it impractical to conduct their banking business at a distance. * * * The factor of inconvenience localizes banking competition as effectively as high transportation costs in other industries. *Id.* at 358, 83 S.Ct. at 1738.

The localization of business typical of the banking industry is especially pronounced where, as here, a country bank is involved:

> We stated in *Philadelphia Bank* * * that "in banking the relevant geographical market is a function of each separate customer's economic scale"— that "the smaller the customer, the smaller is his banking market geographically" * * *. Small depositors have little reason to deal with a bank other than the one most geographically convenient to them. For such persons, geographic convenience can be a more powerful influence than the availability of a higher rate of interest at a more distant, though still nearby, bank. The small borrower, if he is to have his needs met, must often depend upon his community reputation and upon his relationship with the local banker. * * * Thus, the small

borrower frequently cannot "practicably turn for supplies" outside his immediate community; and the small depositor—because of habit, custom, personal relationships, and, above all, convenience—is usually unwilling to do so. United States v. Phillipsburg National Bank and Trust Company, 399 U.S. 350, 363–364, 90 S.Ct. 2035, 2043 (1970).

Individuals and corporations in Greeley, for instance, do not normally deposit their funds in Denver banks, and their counterparts in Denver seldom keep their deposits in Greeley banks. Convenience becomes less important only when banking transactions assume large proportions. Since Colorado prohibits branch banking, FNB Greeley has no other offices in Weld County or in any other location.

The defendants contend that Weld County is the relevant area for measuring the effects of the merger. Approximately 10.7% of FNB Greeley's business comes from the rest of Weld County. Since there are seven other banks serving this expansive area, it is not surprising that this figure is not larger given the incidence of convenience which attends banking. 10.7% would not appear quite so insignificant if it represented, for instance, 80% of the business available in the rest of Weld County. Whatever foreclosures or other anticompetitive effects might result from this merger must be measured, of course, in terms of those being affected. The defendants, however, have failed to introduce sufficient evidence suggesting that the business solicited by FNB Greeley and the other Greeley banks from the rest of Weld County represents a significant share of what is available.

Moreover, the defendants have also stated that the Greeley area is their "primary service area" or the area of effective competition. In their application to the Board of Governors of the Federal Reserve System for approval, they noted:

> *Judgment of Bank's officers as to Bank's approximate service area, the*

*actual or estimated population of such area, and an explanation of the basis for such a service area delineation.*

Greeley's Primary Service Area, that area within which approximately 80% of Greeley's I.P.C. Demand, Savings and Time deposits originate, and within which in excess of 75% of Greeley's loans originate, is more particularly described as follows: Commencing at Eaton, Colorado, located 7 miles north of the city of Greeley, extending in a southeasterly direction approximately 15 miles to the community of Gill, Colorado, thence in a southwesterly direction approximately 23 miles to the community of Platteville, Colorado, thence in a north-northeasterly direction returning to the original point. * * *

In addition to Greeley's Primary Service Area, described above, there exists a "sphere of influence" which extends in an easterly and northeasterly direction from the city of Greeley proper, and covers an area of Weld County large in size but sparsely populated. * * *

In view of the foregoing, it is our conclusion that the proper geographic area is that urged by the government, that is, the City of Greeley and its environs and satellite communities, including the towns of Evans, LaSalle, Peckham, Kersey, Gill, Eaton, Lucerne, Farmers and Bracewell.

### D. EFFECT ON COMPETITION IN COMMERCIAL BANKING IN THE GREELEY AREA

We turn now to the question whether the proposed acquisition has been shown to be in violation of Section 7 of the Clayton Act in that its effect would be substantially to lessen competition in any line of commerce in any section of the country. The government emphasizes the fact that the Bancorporation is the second largest banking institution in the state, and from this fact alone would have us hold that its entry into the Greeley market by way of this acquisi-

tion would in and of itself substantially lessen competition. The government argues that if relief is granted against this present acquisition, Bancorporation will enter the market *de novo* or through some other acquisition, the effect of which would be to promote rather than to lessen competition.

As previously noted, the principal subsidiary of Bancorporation is First National Bank of Denver. Bancorporation's other three subsidiaries are small institutions located on the outskirts of the Denver metropolitan area. They do not add measurably to the economic power of Bancorporation. Nor can it be said that the acquisition of FNB Greeley would significantly increase Bancorporation's economic power since FNB Greeley is not a large bank, although it is the second largest institution in Greeley. It is second to Affiliated Bankshares of Colorado which has three subsidiary banks in the Greeley area and which has 40.2% of the total deposits as against the 31.8% held by FNB Greeley.

We consider it significant that the market share of the FNB Greeley has been on the decrease during the past 20 years. The Greeley National Bank, on the other hand, its principal competitor, has been steadily gaining ground. FNB Greeley is shown by the evidence to lack management depth and to have not been pursuing aggressive competitive policies. Bancorporation promises to remedy all this, whereby the acquired institution will become a vigorous competitive influence. These, of course, are mere promises which are not entitled to weight in the present evaluation except that it can be said with some assurance that the competitive influence of FNB Greeley is unlikely to decrease as a result of the acquisition.

We also consider significant the fact that the population per banking office in the City of Greeley is considerably higher than average. The average population per banking office in Weld County is 5,953 people, where as in the City of Greeley there is an average of 6,484

persons per banking office as compared with a national figure of 5,751 persons per banking office and a state figure of 9,854. It cannot be said then that either Greeley or Weld County is underbanked.

On the question whether the merger eliminates a potential entrant, we must conclude that it does not. The evidence is uncontradicted that Bancorporation has no intention of entering the Greeley market if this acquisition is disapproved. Greeley is shown by the evidence to be experiencing moderate growth, but not boom growth. This and other objective evidence corroborates the testimony from Bancorporation that it does not intend to enter the market apart from the present acquisition. Furthermore, there is no persuasive evidence in support of the conclusion that Bancorporation is now present on the threshold of the Greeley market and thereby exercises an influence on competition. As pointed out above, Bancorporation has not actively competed in the market and its presence in the wings, so to speak, is not apparent.

There is further objective evidence which supports the finding that there will be no *de novo* or other entry by Bancorporation. Testimony from the State Bank Commissioner indicates that a new state charter would not be granted because the growth of the area would not justify it. Approval of a national charter by the Comptroller of the Currency is equally unlikely. The Regional Administrator of National Banks testified that he would not recommend any *de-novo* entry during the foreseeable future. It further appears that charters have been denied in other areas which are faster growing and where the need would seem to be more apparent. Indeed, Bancorporation's application for a new charter in Montbello, which is on the edge of Denver, was denied, and this fact evidences the difficulty of obtaining approval of a new charter in the Greeley area.

Unquestionably, Bancorporation has the financial capability to enter the Greeley market *de novo*, but the practical difficulties, together with the expense, argue against Bancorporation's following this route. One other possibility has been posed by the government and that is the acquisition of the State Bank of Greeley. However, the objective evidence presented here does not suggest that this is or would be a likely possibility.

█ We are constrained to conclude then that there is no possibility, at least from the evidence produced at this trial, that Bancorporation will enter the market in the manner recommended by the government and, further, that there is a dearth of evidence to show that Bancorporation has any threshold influence on competition at the present time. It does *not appear that it is standing in the wings, so to speak, ready to enter the market* and thus serves as a restraining influence on the other institutions in the community, and it cannot be said that its entrance will significantly or substantially lessen either present or potential competition.

It is finally argued that parallelism and other monopolistic practices are very likely once Bancorporation becomes established. We are mindful, of course, that there are two other holding companies presently in the Greeley market. *No evidence whatsoever was presented at the trial which suggests that such practices are being carried on presently,* and while we are not prepared to say that FNB Greeley will become an agressive and vigorous participant in the battle for market shares, we cannot say in all fairness that it will become less competitive than at present.

We have examined the recent decisions of district courts in which the government has sought to obtain injunctions pursuant to Section 7 of the Clayton Act.[9] We have compared the various

9. United States v. First National Bank of Jackson, 301 F.Supp. 1161 (S.D.Miss. 1969); United States v. Idaho First National Bank, 315 F.Supp. 261 (D.Idaho

aspects of these decisions, and we note that notwithstanding that the facts presented by the government were much stronger and more formidable than are the facts in the present case, the government failed to obtain relief in each and every instance. Also, we have carefully considered the decision of the Supreme Court in United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), and the Court's more recent decision in United States v. Phillipsburg National Bank and Trust Company, 399 U.S. 350, 359–362, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970). We have sought to apply the standards laid down by the Supreme Court in those cases to our facts in an effort to arrive at an accurate and fair decision herein. The main difficulty here is the lack of cogent evidence which even suggests that there is likely to be a lessening of competition as a result of this present acquisition. Nothing has been presented which of itself or considered with the total circumstances serves to make any impact. Nor can we see any so-called triggering effect from the acquisition in question. As heretofore noted, there are several bank holding companies in Colorado, and undoubtedly they will continue to seek acquisitions regardless of the outcome of this case. The case at bar, in any event, must be determined on its individual merits and not in relationship to any future horribles.

## IV. VERTICAL FORECLOSURE— LESSENING OF COMPETITION IN THE SALE OF CORRESPONDENT SERVICES

The government's secondary line of attack is that the proposed acquisition will substantially lessen competition in correspondent banking in Colorado. The argument is that (1) the lead bank of Bancorporation—FNB Denver—is one of six suppliers of correspondent bank-

1970) ; United States v. First National Bank of Maryland, 310 F.Supp. 157 (D. Md.1970) ; United States v. Crocker-Anglo National Bank, 277 F.Supp. 133 (N.D. Cal. 1967).

ing services for Colorado; (2) FNB Greeley is a substantial customer or purchaser of these services in the Colorado correspondent banking market; (3) by acquiring FNB Greeley, FNB Greeley will become a captive customer for FNB Denver's correspondent banking services, Bancorporation will effectively foreclose FNB Greeley and hence this will preclude FNB Greeley from becoming a correspondent banking customer of the five remaining suppliers of correspondent banking services in Denver.

There is no judicial recognition of this concept, hence we must consider several questions. *First*, does correspondent banking (or what plaintiff refers to as a "full package of correspondent banking services") constitute an appropriate "line of commerce" or product market within which to measure the substantiality of any alleged foreclosure? *Second*, whether the State of Colorado is an appropriate section of the country or "relevant geographic market" within which to measure the substantiality of any alleged market foreclosure? *Third*, taking into account the appropriately defined market, will the acquisition and resulting foreclosure substantially lessen competition in the geographically defined product market within the meaning of Section 7 of the Clayton Act?

## A. CORRESPONDENT BANKING AS A "LINE OF COMMERCE"

Since the competitive aspect is the main concern under the antitrust laws, the market must be defined in terms of the product or line of products with respect to which there is competition. As stated in Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962):

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.[10]

10. Even if it can be said that when the price of coal (for example) arises high enough, coal users will switch to oil (cross-elasticity), the cost and inconvenience of doing so would normally place

Thus, the issue is whether, in the banking industry in Colorado (or the otherwise relevant geographic market), the various correspondent banking services compete with each other within one product market, or whether they form various more or less distinct, product markets? In order to answer this question, an examination of the economic nature of correspondent banking generally and as specifically set forth in the evidence in this case is necessary.

The legal standard for determining the existence, for antitrust purposes, of a line of commerce appears to be that set forth in Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962). If commercial banking generally is to be considered a broad line of commerce which includes correspondent banking,

> * * * within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593–595, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. Because § 7 of the Clayton Act prohibits any merger which may substantially lessen competition "in *any* line of commerce" (emphasis supplied), it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition.

In terms of the criteria in *Brown Shoe, supra,* the evidence presented in this case is somewhat inconclusive as to whether correspondent banking constitutes a separate and distinct product market (or product submarket of commercial banking generally). The testimony did show that there is within the banking community at least, some recognition of the submarket as a separate economic activity and the alleged "line of products" can be said to have unique production facilities, distinct customers, and specialized vendors. On the other hand, there is no evidence in this case that the "product" has distinct prices or sensitivity to price changes. As to the product's peculiar characteristics and uses, it can be said that the range and diversity of services involved makes it somewhat difficult to classify correspondent banking services as competitive within the same market. At best, the group of services offered varies from bank to bank and the common elements are the demand deposit and the overline loan.

■ From the fact, however, that the alleged line of commerce (apart from the mentioned elements) is diverse and varies from bank to bank, it does not follow that they cannot be legitimately viewed, in a proper case, as a "line of commerce." The United States Supreme Court has held an equally diverse cluster of banking products and services—commercial banking generally—to be a line of commerce.[11]

enough of an external (nonprice) limitation on the demand behavior of coal users that coal and oil will nevertheless continue to exist in separate product markets. On the other hand, if the cost and inconveience of switching from one type of coal to another type of coal has a relatively insignificant effect on the demand behavior of coal users, the two different types of coal will, in all likelihood,

continue to exist in the same product market.

11. We refer to the statement in United States v. Philadelphia National Bank, 374 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L. Ed.2d 915 (1963), wherein the Court said: We agree with the District Court that the cluster of products (various kinds of credit) and services (such as checking

It is noted that the central feature of this alleged line of commerce is the interbank demand deposit, and arguably the larger banks compete for this by offering various services for which little or no charge is made. To this extent only it has the appearance of a line of commerce as the same is defined in *Philadelphia Bank, supra.* But in view of our conclusion that there is not a substantial lessening of competition, we need not decide or comment further.

## B.  THE GEOGRAPHIC MARKET

Plaintiff contends that the relevant geographic market for correspondent banking in Colorado is limited to the State of Colorado. Yet, there is some evidence that the Colorado banks which solicit interbank deposits and offer correspondent banking services "effectively compete" in a wider area. For instance, The First National Bank of Denver regularly travels and solicits interbank demand deposits in areas outside of Colorado including Montana, Wyoming, Nebraska, Kansas, parts of Utah, Idaho, New Mexico, Arizona and Texas. As a result, FNB Denver generates approximately 30–40% of its interbank deposits outside of Colorado. For example, as of December 31, 1969, the 122 Colorado bank customers of FNB Denver comprised 48.8% of its total of 250 correspondent customers on that date, and they supplied 69% of the total of $67.6 million in interbank deposits held by FNB Denver as of that date. At the same time, FNB Denver carried 26 accounts with Wyoming banks, 21 accounts with Nebraska banks, 14 accounts with Montana banks, 14 accounts with North Dakota banks, 11 accounts with Kansas banks, nine accounts with New Mexico banks and nine accounts with banks in Texas.

Plaintiff's argument that areas outside of Colorado should be excluded because non-Colorado banks obtain fewer correspondent services from Denver banks is without merit. It is conceded that even Colorado banks do not normally obtain a "full package" of correspondent services from any one Denver bank, and, in any event, we fail to see a relevant distinction between banks which obtain all of the available correspondent services and those which obtain only some of them.

Plaintiff may have a valid argument in asserting that only Colorado banks can utilize their Denver correspondent as a depository for bonds or other collateral which are required by Colorado law to be posted as security for deposits of the State Treasurer in Colorado banks. Plaintiff also asserts that only Colorado banks would have a demand for utilizing the expertise of their Denver correspondent for advice on matters peculiar to Colorado law, and that Colorado thus constitutes a substantial geographic submarket.

In view of the fact that the effect of this acquisition on competition is insubstantial under either definition of the geographic market, it is unnecessary to make the precise distinction here asserted by the parties.

accounts and trust administration) denoted by the term "commercial banking," * * * composes a distinct line of commerce. Some commercial banking products or services are so distinctive that they are entirely free of effective competition from products or services of other financial institutions; the checking account is in this category. Others enjoy such cost advantages as to be insulated within a broad range from substitutes furnished by other institutions. * * * Finally, there are banking facilities which, although in terms of cost and price they are freely competitive with the facilities provided by other financial institutions, nevertheless enjoy a settled consumer preference insulating them, to a marked degree, from competition; this seems to be the case with savings deposits. In sum, it is clear that commercial banking is a market "sufficiently inclusive to be meaningful in terms of trade realities." * * *

## C. SUBSTANTIALITY OF THE ALLEGED FORECLOSURE EFFECT

The parties have not presented evidence from which the substantiality of the alleged foreclosure effect can be precisely determined. Plaintiff contends that the amount of correspondent bank balances are the best measure of the amount of correspondent banking business done by banks offering such services. However, the evidence is to the effect that the banks themselves use a much more sophisticated and accurate method of accounting for the correspondent banking transactions in which they engage. FNB Denver, for example, analyzes its larger demand deposit accounts in terms of (1) the income generated by the "average balance" after deducting therefrom the 17½% reserve requirement and the "uncollected funds"—i. e., funds which have been deposited with FNB Denver, but have not yet been collected and are thus unavailable for investment; and (2) the expenses to be charged against the account for services rendered. If at the end of a quarterly accounting period the analysis reveals a loss, FNB Denver generally bills the customer for the excess charges. If the amount of "uncollected funds" was a constant percentage of the average balance like the 17½% reserve requirement, then the average interbank demand deposit would be an accurate *relative* measure of the degree of foreclosure. However, the evidence indicates that the proportion of "uncollected funds" allocable to various accounts varies from customer to customer. Thus, the gross average inter-bank balance is at best a very rough, inaccurate approximation of the amount of correspondent banking business done by banks offering such services.

Based on a comparison of interbank demand balances as an acceptable measure of the degree of foreclosure likely to be effected by the proposed acquisition, the foreclosure effect does not appear to be substantial in the context of the banking industry and the particular submarket here involved, however defined. If FNB Denver were to succeed to all of FNB Greeley's correspondent business in FNB Denver's "service area," [12] (and it is not certain that it will succeed to all of it), FNB Denver would gain ³⁄₁₀ths of one percent of service area correspondent balances. Assuming that Colorado is the relevant geographic market, FNB Greeley's correspondent balances represent only somewhat less than ⁷⁄₁₀ths of one percent of the correspondent balances held by Colorado banks (in all banks).[13]

We have considered cases cited by plaintiff to the effect that foreclosure of a relatively small percentage of a national retail sales or supply market constitutes substantial lessening of competition. None of the percentages are as minimal as those involved here.[14] In any event, a local or regional banking market presents a wholly different competitive situation from a national retail sales or supply market in shoes, chemicals, paper or steel. We are not here dealing with nation-wide giant corporations threatening to take over an entire line of commerce and divide it up between them, and the measure of substantiality must

12. Major Denver banks have nearly 90% of their sales of bank services to other banks in a service area which includes Colorado, Kansas, Nebraska, New Mexico and Wyoming.

13. According to plaintiff's statistic, FNB Greeley's correspondent balances represent 1.2% of all such deposits *in the six Denver correspondents* from Colorado banks. This statistic assumes that the market is limited not only to Colorado customers, but to that portion of the Colorado customers' business which remains in Colorado. This percentage, as well, appears to be insubstantial under the circumstances presented by this case.

14. Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); United States v. Kimberly-Clark Corp., 264 F.Supp. 439 (N.D.Cal.1967); United States v. Kennecott Copper Corp., 231 F.Supp. 95 (S.D.N.Y.1964); United States v. Bethlehem Steel, 168 F.Supp. 576 (S.D.N.Y.1958).

be gauged in the context of the particular industry and market involved.

Plaintiff relies on the fact that there is a statewide trend toward bank acquisition which is bound to produce vertical foreclosure in the correspondent banking market relevant here. But most of the evidence of future acquisitions—particularly as concerns Bancorporation's participation—is based on proposed acquisitions which have either not been approved by the Federal Reserve Board or are presently pending litigation. While we must consider the probable *future* effects of *this* particular acquisition, we may not evaluate the effects of this acquisition by prejudging the merits of pending acquisitions which are not presently before the Court.

In sum, we are unable to conclude, in light of the past trend of bank acquisitions up to this point in time, or considering the possible future acquisitions, that the minimal amount of foreclosure which would result from this acquisition constitutes a substantial lessening of competition within the meaning of Section 7 of the Clayton Act. To hold otherwise would serve to automatically preclude an acquisition in *any* instance in which a correspondent relationship had existed or was even potential.

## CONCLUSION

Having concluded that the government has failed to sustain its several allegations that the acquisition in question has the effect substantially to lessen competition, or to tend to create a monopoly in a line of commerce in a section of the country as required by Section 7 of the Clayton Act, it follows that the requested relief must be denied and that the complaint and cause of action must be dismissed. It is so ordered.

The Court's findings and conclusions are contained in this opinion, and hence formal findings and conclusions are dispensed with.

The government is granted a stay of proceedings for 30 days. During this period the statutory injunction will remain in force.